No. 87-92

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

THE STATE OF MONTANA,

   Plaintiff and Respondent,

-vs-

STEVEN WAYNE KEEFE,

   Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Thomas McKittrick, Judge presiding.

COUNSEL OF RECORD:

   For Appellant:

   John Keith argued, Great Falls, Montana

   For Respondent:

   Hon. Mike Greely, Attorney General, Helena, Montana
   Kathy Seeley argued, Asst. Atty. General, Helena
   Patrick L. Paul, County Attorney, Great Falls, Montana

---

Submitted: May 10, 1988

Decided: June 13, 1988

Filed: JUN 1 3 1988

_Ethel M. Harrison_
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant Steven Wayne Keefe appeals his conviction for three counts of deliberate homicide, § 45-5-102(1)(a), MCA, and one count of burglary, § 45-6-204(1), MCA. The Eighth Judicial District Court in and for Cascade County, the Hon. Thomas McKittrick presiding, sentenced Keefe to three terms of life imprisonment (to be served consecutively), ten years for burglary, four ten-year terms for the use of a weapon in the offenses and designated him a dangerous offender not eligible for parole. Keefe asserts only one issue on this appeal: Was evidence of Keefe's other crimes, wrongs and acts properly admitted under Rule 404(b), M.R.Evid., before the State presented evidence of the crime charged? We affirm.

Keefe was charged on March 21, 1986, with the deliberate homicides of Dr. David McKay, a Great Falls opthamologist, his wife, Constance McKay, and their 40-year-old daughter, Dr. Marian McKay Qamar, a Seattle, Washington, pediatrician, at the McKay home three miles south of Great Falls, Montana, on October 15, 1985. The complaint was amended on June 10, 1986 to include a charge that Keefe had stolen Constance McKay's purse from the McKay home on the day of the homicides. After a hearing in Youth Court, Keefe was bound over to District Court for trial as an adult. He pled not guilty to all charges.

Keefe argues that his right to a fair trial on these charges was compromised when the State began its case-in-chief with evidence of other burglaries committed by Keefe that were not charged in this complaint as amended. He contends that such unrelated evidence led the jury to overestimate the probative value of the evidence of burglary

2

at the McKay home and also established him in the eyes of the jurors as an evil man deserving punishment.

There is no argument that the McKays and Dr. Qamar died as a result of criminal acts. The controlling question is whether the State established, prima facie, that Keefe committed these criminal acts. Because there are no witnesses except perhaps a 3-year-old child, no fingerprints, and no confession other than two admissions made to fellow residents at Pine Hills School for Boys, the State was obligated to proceed with circumstantial evidence. Key pieces in this puzzle of circumstances were that Keefe had a history in Lewis and Clark County of similar and repeated burglaries and that at a burglary less than two weeks previous, a .44 magnum Ruger Redhawk revolver and ammunition were stolen. The F.B.I. later linked this weapon to the ballistics of two of the fatal shots in the McKay home. The F.B.I. expert said he could not be positive that the other fatal shot was fired by the gun. It was this gun that Keefe asked a friend to pawn for him on October 16, 1985, the day after the McKay homicides. The gun was recovered by the Cascade County sheriff at the pawnshop on March 4, 1986.

The record demonstrates that there is more than sufficient evidence --albeit circumstantial evidence-- to support this verdict and judgment. Circumstantial evidence is not necessarily inferior in quality and, in fact, often is most convincing and satisfactory. Any evidence that is material, relevant and competent will be admitted in a criminal trial. If the facts and circumstances are of such quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt, the court must accept the verdict of the jury. State v. Cor (1964), 144 Mont. 323, 326-27, 396 P.2d 86, 88-89, citing State v.

Espelin (1938), 106 Mont. 231, 76 P.2d 629; State v. DeTonancour (1941), 112 Mont. 94, 112 P.2d 1065.

We must then examine the record to determine what are the known facts regarding the McKay and Qamar homicides and the circumstances concerning Keefe, which when tied together, lead to the conclusion that Keefe was at the McKay home on the afternoon of the homicides and, in fact, committed the homicides.

Joseph McKay, the son of David and Constance McKay, arrived at his parents' home for a family dinner at about 5:15 p.m. October 15, 1985. His sister, Marian Qamar, and her 3-year-old daughter, Monya, had flown in for a visit earlier that day. Another sister, Octavia McKay Joyner, had greeted the Qamars and had left them at the McKay home at about 2:30 p.m. Joseph McKay entered through an unlocked ground-level door, which opens into the family room. He noticed that a pot of potatoes was burning on the stove in the kitchenette at the rear of the room. He testified that he removed the pot from the stove's burner, and then turned to a hallway, which led to the laundry room on the left, to the garage and a root cellar at the end, and to a staircase to the main floor on the right.

As he entered this hallway, Joseph McKay testified that he found his mother lying on the floor in a pool of blood and realized that she was dead. When he stood up to alert the rest of the family he saw Marian Qamar also lying in the hall and apparently dead. He returned to the family room to call authorities just as his sister, Octavia, and her husband, Don Joyner, drove up to the house. He urged them to keep their children outside and allowed Don Joyner, who is a practicing physician, into the house. Dr. Joyner checked for a pulse on Marian Qamar. He could find none and determined that both women were dead. Sheriff's dispatchers who received Joseph

4

McKay's call told him to exit the house and dispatched deputies immediately. Joseph McKay and Dr. Joyner left the house without climbing the stairs to the main floor.

Sheriff's deputies arrived within minutes and were told of the two bodies on the lower floor and that Dr. McKay and Monya Qamar were unaccounted for. The deputies entered the house through the ground-level door Joseph McKay had used, stepped past the bodies of the two women and came to the base of the stairs leading to the upper floor. Here they noticed six empty shell casings lying on the rug. They stepped over these casings and climbed six steps to a landing that faces the main door to the house and another six steps from this landing to the main floor. As the deputies proceeded through the dining area they noticed Dr. McKay lying dead in the adjacent kitchen. The deputies then checked the bedroom and found Monya Qamar sleeping in one of the beds. One of the deputies picked the girl up and carried her down one flight of stairs to the main door and attempted to open the main door but had to move a heavy rug that had been pushed up against the bottom of the door.

Deputy Jim Bruckner, one of the first sheriff's deputies on the scene, was qualified at trial as a police expert on crime reconstruction. He testified that the investigation indicates that Dr. McKay, who was shot once in the back of the head from the left, was the first victim shot. There were wine glasses laid out on a counter in front of the body and a wine glass lay broken in his hand. This, he said, shows Dr. McKay was unaware of any danger when he was shot. Investigators theorize that Dr. Qamar came to investigate the noise in the kitchen, saw the killer, turned, and was shot at five times as she fled down the two flights of stairs. She may have tried to open the main door, but was prevented from doing so because the rug stopped the door. As

5

she got to the hallway at the gound-level she was struck by a bullet in the back and also by one that tore through her right ankle, and fell either dead or dying in the hallway. Three bullets were located in the walls adjacent to the staircase. The gunman emptied the chamber of the weapon used to kill the victims at the base of the stairs and reloaded. Constance McKay then entered the home from the concrete root cellar adjacent to the garage to find her daughter lying on the hall floor. As she knelt to attend to her daughter, the gunman stepped out and fired a shot into the left side of Mrs. McKay who reeled and fell twenty feet away. Another shot was fired at Constance McKay but missed her and lodged in a baseboard heater. In total, eight .44 magnum rounds were fired in the McKay house.

Upon completion of autopsies, the Cascade County deputy coroner set the time of death as approximately 4:30 p.m. While preliminary investigations revealed no other crime had occurred in the house, deputies later found a pile of coins on a dirt road near the house and family members subsequently determined the purse belonging to Constance McKay was missing from the McKay home. The purse never has been found.

Keefe was seventeen years old at the time of the homicides. At the time, Lewis and Clark County law officers suspected his involvement in four recent burglaries, at one of which a .44 magnum Ruger Redhawk revolver was stolen. Keefe travelled to Great Falls on October 10, ostensibly to seek employment at a new Buttrey's supermarket; he stayed the weekend with several acquaintances and showed the .44 revolver to his roommates and several of their friends.

The day after the McKay homicides, Keefe requested that a roommate who was of legal age, Michael Hayashi, assist him in pawning a portable radio/stereo stolen from one of the recent Helena burglaries and later the .44 magnum Ruger

Redhawk. Keefe had Hayashi pawn the .44 magnum Ruger Redhawk revolver, the weapon used to kill the victims, for $75 because he said he needed the money for a trip to Helena, even though a second roomate, Toby Scott Yadon, a day or two before the victims were killed, offered him $250 for that same .44 magnum Ruger Redhawk revolver. Keefe had refused this offer because he had said he wanted more money for the revolver. The items, thus, were placed in hock on October 16, 1985 at a Great Falls pawnshop. Later that same day, Keefe was detained by the Great Falls police on a Lewis and Clark County court order and held for Helena authorities who transferred him back to Pine Hills School for Boys because of his recent burglaries.

It was during this confinement at Pine Hills that Keefe told of the McKay homicides to other residents. One resident testified that he and Keefe had been discussing burglaries when Keefe admitted that he also had killed people. This witness testified that Keefe said he had left a party and gone to a lady's house and that when the lady had come out of the kitchen he shot her and that when two people came down stairs to investigate he shot them also. The witness testified that Keefe said the lady was named Constance; the witness also testified he had not heard of the McKay homicides before his discussion with Keefe.

A second resident testified that in mid-November, 1985, he and Keefe were alone in a music room when Keefe related that he had shot and killed three people while burglarizing a home near Great Falls. The witness testified that Keefe said he had broken in through sliding glass doors and killed Dr. McKay when he came to investigate and then shot the two women when they came down to investigate. This witness testified that he did not reveal this conversation until after Keefe's arrest.

7

When trial commenced in Cascade County District Court on October 16, 1986, the State began its case-in-chief by calling twenty-six witnesses who testified as to five burglaries or attempted burglaries attributed to Keefe. Defense objected to this practice claiming that it was inherently prejudicial since it presumed that these crimes were sufficiently similar to the McKay crime to be introduced under Rule 404(b), M.R.Evid. To cure any potential defect the State filed a sealed affidavit with the court one week before trial setting out what this evidence would prove. The actual testimony of these witnesses demonstrated that:

*On July 22, 1985, between the hours of midnight and 8 a.m., somebody entered the Helena valley home of Arlene Wall while she slept and removed her purse and camera. No harm was done to anyone. Mrs. Wall's keys and credit cards were surrendered to the Lewis and Clark County authorities by Keefe's mother, Mrs. Vera Parmer.

*On August 3, 1985, Patrick Wall, the son and neighbor of Arlene Wall, returned to his home at 2 a.m. to find an unknown pickup truck near his home and his home's front door broken open. He found that a camera and .22 caliber pistol had been stolen. No harm was done to anyone. The pickup was later found to be registered to Keefe's mother and the .22 caliber pistol was later found in Keefe's possession.

*On October 2, 1985, between the hours of 6:45 p.m. and 10 p.m., the basement window to Ron Garvin's Helena-area home was broken and a .44 magnum Ruger Redhawk revolver, four boxes of ammunition, and a portable radio/stereo were stolen. Keefe's fingerprints were found on the glass of the broken window. No harm was done to anyone although a neighbor testified he heard gunshots in a field nearby at about this time. The F.B.I. specialist testified that this gun, which Keefe admitted he showed-off in Great Falls, matched the

8

ballistics of two of the fatal shots, and also could have fired the third.

*On October 10, 1985, a daylight burglary occurred at the residence of Ray Bell, Mrs. Parmer's employer. Nobody was injured in this crime since the house was unoccupied but a portable radio/stereo, a camera, and a .38 caliber pistol were stolen. Mrs. Parmer testified that she saw the camera in Keefe's belongings as he packed for his trip to Great Falls and she returned it to Bell. The radio/stereo was pawned for Keefe by his friend Michael Hayashi, the same day as Garvin's .44 magnum Ruger Redhawk was pawned.

*At about 9:30 p.m. on October 12, 1985, Dr. Paul Wilhelm heard somebody ring the doorbell at his home north of Great Falls. He was suspicious because he was expecting no company; he checked from windows but could see nobody at the door. Dr. Wilhelm then carefully shined a light on a vacant hill and fired two shots. He heard a person run away. Dr. Wilhelm's home was not entered and nobody was harmed. The next day he found footprints near his home which were later photographed. F.B.I. specialists later matched these photographed footprints to a pair of Keefe's shoes.

The State called twenty additional witnesses to testify about investigation of these other crimes before it introduced any evidence of the McKay crime. The District Court allowed such evidence to be admitted over strong and repeated objections from defense counsel. It ruled less than a week before trial that the State could mention the other crimes in its opening statement and use the evidence before any evidence from the McKay homicides was in. The court admonished the jury on three occasions during the presentation of this evidence and at the conclusion of the trial repeated the admonition as an instruction:

9

> The State has just offered evidence that
> the defendant at another time engaged in
> other crimes, wrongs or acts. That
> evidence was not admitted to prove the
> character of the defendant in order to
> show he acted in conformity therewith.
> The only purpose of admitting that
> evidence was to show proof of motive,
> opportunity, plan, knowledge, identity,
> absence of mistake or accident. You may
> not use that evidence for any other
> purpose.
>
> The defendant is not being tried for that
> other crime, wrong or act. He may not be
> convicted for any other offense than that
> charged in this case. For the jury to
> convict the defendant of any other
> offense than that charged in this case
> may result in unjust double punishment of
> the defendant.

Keefe testified in his own behalf. He admitted to the Helena burglaries but claimed he never was at the McKay home. On the afternoon of the McKay homicides-burglary, he claimed he was applying for a job at Buttrey's, returning rented video-cassettes, and having a key made for the residence at which he was living. He also said that any of several persons he had shown the stolen .44 magnum Ruger Redhawk revolver knew where he kept it. He claimed the other Pine Hills residents had lied when they said he had admitted to the killings. Keefe called no other witnesses.

The jury convicted Keefe of all counts on October 22, 1986.

It is against this backdrop of factual and circumstantial evidence that we must determine whether the District Court properly allowed evidence of the other crimes to be introduced under Rule 404(b), M.R.Evid., which states:

> Character evidence not admissible to
> prove conduct, exceptions; other crimes;
> character in issue.
>
> . . .
>
> (b) Other crimes, wrongs, acts.
> Evidence of other crimes, wrongs, or acts
> is not admissible to prove the character
> of a person in order to show that he
> acted in conformity therewith. It may,
> however, be admissible for other
> purposes, such as proof of motive,
> opportunity, intent, preparation, plan,
> knowledge, identity, or absence of
> mistake or accident.

This Court established the rules for use of evidence of other crimes and wrongful acts in State v. Just (1979), 184 Mont. 262, 602 P.2d 957, citing State v. Jensen (1969), 153 Mont. 233, 455 P.2d 631. In order to introduce evidence of other crimes or wrongful acts, the State must demonstrate four substantive factors: (1) that the other crimes or wrongful acts are similar; (2) that the other crimes or wrongful acts are not remote in time; (3) that the other crimes or wrongful acts tend to establish a common scheme, plan or system; and (4) that the probative value of the other crimes or wrongful acts is not substantially outweighed by their prejudice to the defendant. Just, 602 P.2d at 961. It is this fourth element that is most significant in this case since Keefe argues on appeal that the State's use of other crimes and wrongful conduct before evidence from the McKay homicides was presented prejudiced his case. We have recognized that "[e]vidence of other acts, . . . invariably will result in prejudice to the defendant to a certain degree." Just, 602 P.2d at 961.

> Prejudice in cases such as this manifests
> itself in three forms. First, proof of
> other offenses subjects a defendant to

> surprise by requiring [him] to defend
> against a crime not charged. . . Second,
> the jury might overestimate the probative
> value of the evidence and assume that
> merely because the defendant has
> committed crimes before, he is likely to
> be guilty of the crime charged. . .
> Third, the evidence may indicate to the
> jury that the defendant is a proper
> candidate for punishment . . . (Citations
> omitted.)

State v. Hansen (1980), 187 Mont. 91, 99, 608 P.2d 1083, 1088.

To cure the problem of such undue prejudice outweighing the probable value of the evidence, the _Just_ test incorporates three procedural requirements. First the State must notify the defendant prior to trial that evidence of other crimes or wrongful acts will be introduced and indicate the purpose for the use of such evidence. _Just_, 602 P.2d at 963-64. Under the Federal Rule 404(b), which is identical to the Montana rule, as many as ten permissible purposes for the introduction of prior crimes and acts have been identified. These include:

> . . .

> (2) To prove the existence of a larger
> plan, scheme, or conspiracy, of which the
> crime on trial is a part. This will be
> relevant as showing motive, and hence the
> doing of a criminal act, the identity of
> the actor, or his intention.

> . . .

> (6) To establish motive. The evidence
> of motive may be probative of the
> identity of the criminal or of malice or
> specific intent. An application of this
> principle permits proof of criminal acts
> of the accused that constitute admissions
> by conduct designed to obstruct justice
> or avoid punishment for a crime, or of

12

> the crimes that motivated the interference with the enforcement of the law.
>
> . . .
>
> (9) To prove identity. Although this is indisputably one of the ultimate purposes for which evidence of other criminal conduct will be received, the need to prove identity should not be, in itself, a ticket to admission. Almost always, identity is the inference that flows from one or more of the theories just listed . . .

McCormick on Evidence (1984), 3d Ed., pp. 558-563.

Second, the District Court must admonish the jury as to the limited purposes of the prior crimes and acts evidence, and third, the District Court must offer a final instruction stating "in unequivocal terms" that the evidence of other crimes or acts has limited purposes and that the defendant is not on trial for those crimes or acts. Just, 602 P.2d at 964.

On June 9, 1986, more than a month before Keefe's original trial date and more than four months before Keefe eventually went to trial, the Cascade County Attorney's office filed notice to Keefe and his attorneys that it would introduce "evidence of other crimes, wrongs, or acts . . . for the purposes of proving motive, opportunity, preparation, plan, knowledge, and identity . . . " It listed witnesses from the Wilhelm, Garvin, Bell and Patrick Wall incidents, among others. The notice was amended on October 7, 1986, one week before jury selection began, to include evidence from the Arlene Wall residence. It appears the defendant had timely and proper notice with adequate time to respond.

13

Also present is an admonition to the jury, which the court read three times during the introduction of evidence of Keefe's other crimes and wrongful conduct. Although the State called twenty-six witnesses to testify about these five incidents, the three readings of the admonition is sufficient under the Just test. In State v. Tecca (Mont. 1986), 714 P.2d 136, 43 St.Rep. 264, the defendant-appellant argued that the jury must be admonished whenever any witness presents evidence of other crimes or wrongful acts. No authority was presented for that contention and we ruled that Just does not require an admonition every time the evidence comes in. Tecca, 714 P.2d at 140.

Neither is the third Just procedural aspect lacking in the instant case. The admonition read by the District Court and issued again as a final instruction is identical to the cautionary instruction used in Tecca, which this Court found to be a "proper cautionary instruction meeting the third procedural requirement of Just." Tecca, 714 P.2d at 140. Because all three procedural requirements of Just have been met, we cannot say as a matter of law that the prejudicial nature of the other crimes and wrongful acts evidence exceeds its probative value. State v. Clausen (Mont. 1987), 740 P.2d 679, 681, 44 St.Rep. 1308, 1311. The probative value of the evidence is determined from the remaining Just factors. Because Keefe concedes that none of the incidents were remote in time, the remaining two substantive factors, similarity of acts and tendency to show common scheme, plan, or system, are reviewed.

Keefe has argued throughout that although the burglary of the McKay home and theft of Mrs. McKay's purse might be like certain of his acts, a purse is such a common target of burglaries that it proves nothing. We note, however, that the other crimes and wrongful acts evidence shows that he had

14

stepped into Mrs. Wall's home and taken her purse; that he had recently committed daytime and early evening burglaries at the Bell and Garvin homes; that after the Garvin burglary he had fired the .44 magnum he stole; that three days before the McKay homicides Keefe was chased away from the Wilhelm home by gunshots, and the day after the McKay homicides he pawned the gun at a price lower than an outstanding offer to buy.

> The prior . . . acts . . . have a similarity of inherent probability . . . There is the hand of a plan with an ulterior motive carrying out an intent by scheme and design of the defendant that was a resultant common course of conduct.

Just, 602 P.2d at 961. Evidence of other crimes or wrongs is admissible if it goes to an issue other than the defendant's character or disposition to commit a crime. State v. Matson (Mont. 1987), 736 P.2d 971, 976, 44 St.Rep. 874, 880. Keefe's actions were links in a chain of burglaries that culminated at the McKay home. The evidence of other crimes and acts was probative and properly admitted as a part of the prosecution's case. They demonstrated the existence of a common scheme or plan by Keefe to commit burglaries and thefts and as such were properly admitted. See, Matson, 736 P.2d at 976.

Under Rule 404(b), M.R.Evid., the prior crimes and wrongs need not be proven beyond a reasonable doubt because they are not offered to prove guilt of those other crimes or acts. Just, 602 P.2d at 963. Even when the evidence of prior crimes or wrongful acts is not sufficiently common or related it is admissible if it tends toward the conclusion that the defendant is guilty of the crime charged with moral certainty and beyond a reasonable doubt. Matson, 736 P.2d at 977. The evidence of prior crimes rises to the appropriate

15

level and is buttressed by Keefe's admissions to the Helena crimes. Thus, it demonstrates a common scheme or plan.

It is within the District Court's discretion to decide whether it will permit such evidence into a criminal case. Matson, 736 P.2d at 976. The court also has the discretion to decide the order of proof. State v. Stever (Mont. 1987), 732 P.2d 853, 44 St.Rep. 283. There is a triumvirate of responsibility when such evidence comes to be at issue. The State cannot expect admission of such evidence routinely without a showing of need for the evidence even if the Just requirements are met; the defense, on the other hand, cannot rely on the general rule of exclusion of such evidence unless the Just requirements fail; and the District Court must make a conscientious decision on the admissibility of the evidence considering all four substantive Just requirements as a whole. State v. T.W. (Mont. 1986), 715 P.2d 428, 430-31, 43 St.Rep. 368, 371-72.

A review of the record shows that counsel for Keefe and for the State argued the question of whether Rule 404(b) other crimes and wrongs evidence could precede the State's case-in-chief at three separate hearings before the start of the trial. We note that the transcripts show that the District Court was reluctant to accept the evidence of other crimes and wrongful acts before the State's case-in-chief. At the first hearing, the District Judge stated his problem succinctly:

> THE COURT: I guess the point I'm making is I'm being asked . . . at this time to make a ruling [on the admissibility of other crimes and wrongs evidence] when I'm really in a vacuum. I don't know what the facts are on either side. I don't know whether or not the probative value outweighs the prejudicial nature of the evidence. I don't know whether it's relevant. I don't know whether they're

16

> similar in nature. I don't know whether
> they tend to establish a common scheme,
> plan, or design.

At the end of the first hearing, the court ruled that it was satisfied the Just requirement that notice be given had been met. The court said it would allow the other crimes and wrongs evidence to be admitted at trial "if the State can prove it's relevant and that the probative value outweighs the prejudicial value . . . " The court noted that it could not address the substantive factors of Just since it did not know the State's case and would be receptive to motions to exclude certain testimony as irrelevant.

The second and third hearings occurred in the week prior to the trial. At the second hearing, the court stated that its decision that the Just notice was in proper form, did not mean the evidence contained therein was automatically admissible. Accordingly, the court instructed the State to alert the court before it presented evidence of other crimes so that a hearing could be held outside of the jury's presence to determine if that particular piece of evidence is relevant.

The State said it was proceeding in a chronological, sequential fashion in order to show "the pattern, the mode, and so forth." The defense said it would be impossible to effectively argue against pieces of this other crimes evidence when presented in this order since the evidence of the case-in-chief would not have been presented.

> THE COURT: What you're saying is we
> don't even know what the facts of this
> case are, so how can we compare as to
> whether there is similarity, whether
> there is remoteness in time, whether or
> not any of the facts anywhere remotely
> are connected? And how would I be able
> to determine that not knowing what the
> facts are in the case-in-chief?

17

> . . .
>
> MR. KEITH [defense counsel]: Until the witnesses get up and testify we don't know anything. The witnesses have to get up and testify first.
>
> THE COURT: The court is going to reserve the ruling on the admissibility on these items, and I would suggest to the State at this time that Mr. Keith has made a very valid point . . .

The State then prepared an affidavit for the court outlining the evidence of prior crimes and wrongs. The affidavit outlined the testimony the State would elicit from the Helena burglary victims, Dr. Wilhelm, and listed other witnesses who investigated the crimes or would verify chains of custody. The affidavit did not describe the evidence that would be introduced from the McKay home. It stated that the other crimes and wrongs evidence demonstrates:

> 1. Intent, motive, plan, common scheme and identity in that defendant burglarizes isolated residences in day or night time; he acts alon[e]; he likes weapons; is not afraid to enter homes that may be occupied; and that his plan and common scheme over three months was to burglarize and steal from these isolated residences. Defendant is charged with burglary, as well as three counts of deliberate homicide.
>
> 2. The crimes are all similar in nature.
>
> 3. The nearness in time is well demonstrated by being no longer than three months and as soon as 3, 5, and 13 days prior to October 15, 1985.
>
> 4. The tendency to establish common scheme i[s] that there is a continuous pattern of behavior which is amply demonstrated here.

> 5. The probative value outweighs any prejudice to defendant in that all the evidence points to identity. While defendant admits stealing and pawning the murder weapon he can still attempt to shift blame to his two roommates. However, the evidence is overwhelming that the crime follows defendant's pattern of conduct and not those of his roommates.

In addition, the State cited State v. Powers (1982), 198 Mont. 289, 645 P.2d 1357, and State v. Riley (1982), 199 Mont. 413, 649 P.2d 1273, at a third pre-trial hearing as authority for presenting evidence of other crimes before the case-in-chief. The defense countered that the State was using other crimes evidence to create its case-in-chief rather than to support it. The court inquired of the assistant county attorney:

> THE COURT: [U]nder the normal use of 404(b) evidence as I understand it, the Court can take the proffer of proof that I get at a side-bench conference . . . I can look at that, and I can compare to the case-in-chief that [has] already gone in to the Court and gone in front of the jury. You're asking me to make a ruling in a vacuum. You're asking me to go on the basic premise that everything you're offering is going to be admissible. And that's the danger. What if the thing is not admissible? . . .

> MR. HAGERMAN: Well, Your Honor, in many different cases, this type of evidence has been argued in motions in limine . . .

> THE COURT: Mr. Hagerman, have you ever been in a case when 404(b) evidence went in before the case-in-chief?

> MR. HAGERMAN: I personally have not, Your Honor.

19

THE COURT: I have not either, and I have tried many, many cases . . .

Neither Powers nor Riley states that the prosecution may introduce evidence of other crimes or wrongful acts before its case-in-chief. Powers stands for the proposition that evidence of other persons' acts in disciplining children and acts by defendant in disciplining children other than the victim may be introduced to show a common design. The similarity in discipline methods provided proof of the defendants' motive, as well as intent and plan. Powers, 645 P.2d at 1363. In Riley, this Court noted that the State is allowed "to present the entire corpus delecti of the charged offense including matters closely related to the offense and explanatory of it, even when such evidence discloses crimes other than those charged." Riley, 649 P.2d at 1279. While Riley says the jury is allowed to view the victim's death in the context of prior events, it does not say such evidence is automatically permissible if entered chronologically. Riley, 649 P.2d at 1280.

The District Court did not err in allowing the prosecution to present its evidence in the chronological sequence used in this case.

When a District Court has received an offer of proof, as in this case, where the affidavit and arguments have been presented by the prosecution for the chronological presentation of evidence admissible under the Just standards, the District Court has discretion to allow the sequence and order of presentation.

Appellant has argued that the presentation of evidence by the prosecution of other crimes and acts prior to the entered presentation of evidence of the deliberate homicides unduly focused the jury's attention on the other crimes and acts for which the defendant was not being tried.

20

The transcript reveals that in the opening statements of both the prosecution and the defense, there is left no doubt that the jury was apprised of the crimes for which the defendant was being tried. Timely notice was given to the defense on more than one occasion of the chronological order of proof to be offered by the prosecution and the defense had timely notice and opportunity to argue in opposition to this proposal. The District Court carefully heard and considered the prosecution's proposal and the defense's opposition, which included the offer of proof presented by the prosecution.

Section 46-16-401, MCA, provides for the order of trial in criminal cases and requires that the county attorney must state the case and offer evidence in support of the prosecution. Section 46-16-402, MCA, states: "When the state of the pleading requires it <u>or in any other case for good reason and in the discretion of the court</u>, the order prescribed in 46-16-401 may be departed from." (Emphasis added.)

Further, Rule 611(a)(1), M.R.Evid., provides:

> <u>Mode and order of interrogation and presentation; re-examination and recall; confrontation</u>.
>
> (a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, . . .

In the present case, the District Court reserved judgment on the admissibility of the other crimes and wrongful acts evidence until after the State had filed a sealed affidavit demonstrating what that evidence would show. We find no abuse of discretion by the District Court. The

State satisfied the <u>Just</u> requirements. Its use of evidence of other crimes and wrongful acts was sufficient to prove motive, plan, opportunity, and identity. See <u>Cor</u>, 396 P.2d at 89. The District Court exercised its discretion painstakingly and conscientiously. We will not disturb that judgment.

Affirmed.

_John Conway Harrison_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_[signature]_

_John C. Sheehy_

_R. C. McDonough_

_William E. Hunt_

_A. C. Gulbrandson_
Justices