No. 87-251

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

STATE OF MONTANA,

        Plaintiff and Respondent,

-vs-

DAVID THOMAS DAWSON,

        Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Jeffrey Renz argued, Billings, Montana
        Allen Beck, Billings, Montana
        Gary Wilcox, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Barbara Claassen argued, Asst. Atty. General, Helena
        Harold Hanser, County Attorney, Billings, Montana
        Dennis Paxinos, Deputy County Attorney, Billings

Submitted: June 13, 1988

Decided: August 23, 1988

Filed: AUG 2 3 1988

*Ethel M. Harrison* (signature)
_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

A jury in the District Court for Yellowstone County convicted defendant Mr. Dawson of three counts of deliberate homicide, four counts of aggravated kidnapping, and one count of robbery. He was sentenced to death for each of the three deliberate homicides and for each of the three aggravated kidnappings which resulted in the death of the victim. Defendant appeals his conviction and death sentences. We affirm on all issues.

The issues are:

1. Was Detective Hatfield's entry into and search of the defendant's motel room an unconstitutional search?

2. Did the District Court's reaction to the testimony of the surviving victim prejudice the case?

3. Were the sexual paraphernalia and magazines improperly admitted into evidence?

4. Did the prosecutor improperly comment upon the defendant's silence?

5. Was the defendant denied a jury trial as to those facts of the crime which are now denominated as aggravating circumstances, and does the evidence support the court's findings on those circumstances?

6. Did the trial court err by considering the defendant's silence at trial in imposing the death penalty?

7. Did the sentencing judge improperly consider the victim impact statement and characteristics of the victim?

8. Should a jury have participated in the sentencing process?

9. Should the absence of a prior criminal history on the part of the defendant be treated as sufficiently substantial to warrant leniency?

2

10. Does § 46-18-305, MCA, violate the Eighth Amendment?

11. Review of the sentence under § 46-18-310, MCA.

The four members of the Rodstein family were staying at the Airport Metra Inn in Billings, Montana, preceding a family move from Billings to Atlanta, Georgia. The defendant checked into the room next to theirs at approximately 4:45 a.m. on Friday, April 18, 1986. At about 5:00 a.m., the teenage daughter of the Rodsteins, Amy, went outside to load the family car. The defendant, carrying a duffel bag from which a gun protruded, followed her back to her room. He then took all members of the family to his own room, where he bound and gagged all of them but Amy. He directed her to help him move the family's belongings into his room. Then he bound and gagged Amy and went through the family's belongings, taking out credit cards, cash, and jewelry.

The defendant injected Mr. and Mrs. Rodstein with an unknown substance which he said would make them sleep. Sometime shortly thereafter, they were strangled to death with a telephone cord. The bodies were placed under the sink in the rear of the motel room and were covered by a bedspread. Amy, who lay bound and gagged on the floor in another part of the room, did not see her parents being strangled or their bodies being moved.

Later that day, the defendant gave the 11-year old Rodstein boy, Andrew, a liquid to drink which caused him to sleep. Andrew was strangled to death and his body was placed with those of his parents. Again, Amy did not see the murder or her brother's body being moved. The defendant had Amy help him move the Rodsteins' vehicles from the motel parking lot to an area behind a nearby gas station. The defendant also gave Amy a liquid to drink, but while he was not looking she dumped it on the bedspread and covered the wet area with a pillow.

3

During the day on Saturday, the defendant and Amy left the motel room several times. During these trips, the defendant made several phone calls, went to the bank, went to a fast food store, and stopped at his own apartment and a friend's house. Amy did not attempt to get away because she believed her family was still alive and that an escape attempt might jeopardize their lives.

On Saturday evening, Billings police conducted an investigation at the motel after receiving reports that the Rodsteins were missing. The investigation is described more fully under Issue I. Briefly, after the defendant had come out into the parking lot and talked with the police several times, Detective Hatfield went to the defendant's motel room door and asked permission to look through his room. When the defendant changed his position and opened the door slightly, Detective Hatfield entered the room and noticed the bedspreads in the back of the room. The defendant said, "Amy, they're here to help you," or words to that effect. Detective Hatfield found the bodies of the Rodsteins and summoned other officers for assistance. Detective Hatfield found Amy in the bathroom where the defendant had instructed her to stay after he observed the police outside.

An autopsy revealed that Mr. Rodstein died of asphyxiation. He had been strangled with "a great deal of force." He also had several bruises on his scalp. Although needle marks were present in his arms, the substance with which he had been injected could not be identified. Mrs. Rodstein had also died of asphyxiation. Her blouse, brassiere, and jeans had been opened prior to her death, but no evidence of sexual assault was found. She, too, had bruises on her head and needle marks on her arm. Andrew had also died of asphyxiation by strangulation. On his chest were a number of bruises

4

"as if the skin were pinched very hard, very firmly, either by a finger or perhaps some object, some instrument."

The defendant did not testify at trial, but he had made prior statements to other trial witnesses about a third party being involved. His defense at trial was that a third person committed the homicides or compelled him to commit the homicides. The jury found the defendant guilty on all counts charged.

## I

Was Detective Hatfield's entry into and search of the defendant's motel room an unconstitutional search?

The factual circumstances surrounding Detective Hatfield's entry into the motel room are critical to the resolution of this issue. Therefore, we set out the facts in detail.

When the officers from the Billings police department arrived at the Airport Metra Inn shortly before 11 p.m., they knew that the Rodstein family had been missing for over 24 hours and that the family's two cars had been seen near the motel. The officers parked near the Rodstein vehicles. A neighbor of the Rodsteins who had followed the officers to the motel confirmed that the vehicles belonged to the Rodsteins.

Detective Hatfield learned from the motel clerk that the Rodsteins had been assigned Room 149 for Wednesday and Thursday nights. The room had since been assigned to a person from Bozeman. The clerk also told the detective that a person named John Monroe had been in Room 151 for a couple of days, and that John Monroe was driving a black Volkswagon bug.

When Detective Hatfield returned to the Rodsteins' cars, another detective told him he had seen a man come out of Room 151 three times while Detective Hatfield was in the motel

5

office.  The individual was then outside, and Detective Hatfield approached and asked if he was John Monroe.  The defendant said that he was John Monroe, and Detective Hatfield identified himself as a Billings police officer.  He told the defendant that they were looking for the owners of the Rodsteins' cars.  The defendant stated that he knew nothing about the cars or their owners.  Detective Hatfield testified that the defendant did not appear to be under the influence of drugs.

The police officers proceeded to search the Rodsteins' cars.  The defendant then approached Detective Hatfield and said he had helped a female between the ages of 12 and 29 start one of the cars one night.  He also told them that someone had been "messing around" with the cars in the parking lot one night.  Then he returned to his room.

The officers proceeded to go through Room 149 and all the unoccupied rooms on that side of the motel.  One of the officers went to Room 151, knocked on the door, and spoke with the defendant just outside the room.  At that time, the defendant gave the officer his real name and stated that he had registered under a false name because he was with a married woman.  He also said that he had noticed that the Rodsteins' cars had been moved while he was staying at the motel.

After checking the unoccupied rooms, the officers decided they ought to check Room 151 because they were becoming suspicious of the defendant.  Detective Hatfield knocked on the door of Room 151 and the defendant opened it, dressed only in a yellow towel.  Detective Hatfield stated that he would like to check the room.  Defendant asked why and the detective replied that they were looking for anything which might help them locate the Rodsteins.  At this time, Detective Hatfield was standing just outside Room 151 and the

6

defendant was standing in the doorway, with the door ajar. Detective Hatfield testified that the room was dimly lit; the only light may have been that given off by the television. The detective asked if the defendant's girlfriend was in the room and the defendant said, "No." Detective Hatfield testified that at that point the defendant "stepped back away from the door pulling the door with him." Detective Hatfield stepped into the room. He testified that it was his impression that the defendant had by his actions invited him to step inside.

At that point, Detective Hatfield noticed that the bedspreads from the beds were piled in the rear of the room. Defendant stated, "The bedspreads are in the back of the room." Detective Hatfield testified that he said, "Yes," and asked why, at which point the defendant said, "Amy, they are here to help you. You are going to be okay," or words to that effect. Detective Hatfield knew that Amy was the name of the missing girl. Detective Hatfield testified that he looked at the defendant for a moment and the defendant said, "She is in the bathroom."

Detective Hatfield directed the defendant to stay where he was and went to the rear of the motel room. He saw bound legs protruding from under the bedspreads, went back to the front of the room, and signaled the other officers to come in. Detective Hatfield then returned to the back of the room, ascertained that Mr. and Mrs. Rodstein and Andrew were dead, opened the bathroom door, and found Amy, who was physically unharmed.

In order to overcome the presumption against waiver of the constitutional right prohibiting warrantless searches and seizures, the State must show that the defendant gave unequivocal, specific consent to entry, uncontaminated by duress or coercion. State v. Brough (1976), 171 Mont. 182,

7

185, 556 P.2d 1239, 1241. "The question of voluntariness largely depends upon the facts of each case, no single fact being dispositive . . . The determination of voluntariness, rather, depends upon the 'totality of the circumstances'. . . . [T]he issue of voluntariness is a factual one addressed to the discretion of the trial court." [Citations omitted.] State v. Allies (1979), 186 Mont. 99, 111, 606 P.2d 1043, 1049-50, appeal after remand, 621 P.2d 1080.

Defendant argues that Detective Hatfield's entry into the motel room was not justified by his consent. He cites State v. LaFlamme (1976), 170 Mont. 202, 551 P.2d 1011, in support of his argument. In that case, this Court stated,

> [I]t is clear that in the absence of a positive verbal assent to the search, equivocal conduct alone is insufficient as a basis for an inference of consent to search, which is a waiver of a constitutional right.

LaFlamme, 551 P.2d at 1013. The defendant there was suspected of shooting at and damaging a weigh station near Broadus. Two police officers approached the defendant and asked if a ballistics examination could be made of his weapon. Defendant agreed, and looked for the gun but did not find it. The officers suggested that the defendant look in his pickup truck, which he did. After a brief search, the defendant stated, "Well, I guess it's not here." The sheriff said, "How about behind the seat?" Defendant responded, "Well, I don't think so." The sheriff tipped the seat ahead and uncovered the gun. This Court affirmed the lower court's conclusion that clear and unequivocal consent to the search was not present, even though the sheriff believed from the circumstances that the defendant had consented to the search.

8

After considering the totality of the circumstances in the present case, the District Court concluded that the defendant's conduct in admitting Detective Hatfield to the motel room was unequivocal. Defendant had been more than willing to talk with the police officers during their investigation at the motel. He not only stepped back from the door after stating that his girlfriend was not there, but also opened it wider. He did not object by actions or words to Detective Hatfield entering the room for the few moments they stood inside the door talking. The facts of this case support the conclusion that he voluntarily and unequivocally consented to Detective Hatfield's stepping across the threshhold of his motel room. We hold that the District Court's ruling on this issue was not an abuse of discretion.

Following oral argument and submission of this case to the Court, defense counsel called the Court's attention to a recent Ninth Circuit case, United States v. Winsor (9th Cir. 1988), 846 F.2d 1569. That case involved a visual search of a hotel room after police demanded that the door be opened. Because Detective Hatfield's initial entry into the motel room was consentual, and in the absence of any demand for entry, Winsor is not applicable as to the initial entry.

Further, where exigent circumstances exist, a warrantless search and seizure may be reasonable. Warden v. Hayden (1967), 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782; State v. Dess (1982), 201 Mont. 456, 655 P.2d 149. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Warden, 387 U.S. at 298-99. Although the United States Supreme Court has not applied an exigent circumstances rationale to a situation directly comparable to the one here, the Ninth Circuit has formulated a rule which we will apply:

9

> When police officers, acting on probable cause and in good faith, reasonably believe from the totality of circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons, exigent circumstances justify a warrantless entry, search or seizure of the premises.

United States v. Kunkler (9th Cir. 1982), 679 F.2d 187, 191-92.

We hold that following the defendant's statements to the effect that, "Amy, they are here to help you," and, "She's in the bathroom," the exigent circumstances justified Detective Hatfield's limited search of the motel room. It was probable that the Rodsteins were somewhere in the vicinity of the Airport Metra Inn, where their vehicles were found. In the opinion of Detective Hatfield, an experienced police officer, the defendant had acted in an odd or suspicious manner including his several approaches to the investigating officers, his inconsistent statements about what he knew about the Rodsteins, and his use and then abandonment of a false name. Finally, the officers knew that the defendant had been in the room adjoining the Rodsteins' room for several days. When the defendant called to someone, using the name Detective Hatfield knew was that of the missing girl, and then told the officer, "She is in the bathroom," we conclude that Detective Hatfield had probable cause to search the room for the missing family.

Further, the police were faced with the probability that serious misfortune had befallen the Rodsteins, who, according to their friends and family, uncharacteristically had been missing for over 24 hours. We conclude that Detective Hatfield, acting on probable cause and in good faith, reasonably believed from the totality of the circumstances that there was a risk of danger to the Rodsteins justifying a

10

search of the defendant's motel room. We hold that the exigent circumstances justified Detective Hatfield's warrantless limited search of the room, during which he found Amy and the bodies of her family. Before a complete search was done of the room, a search warrant was obtained.

In sum, we hold that there was no violation of the defendant's right to be free from unreasonable searches and seizures. Defendant consented to the initial entry, and then exigent circumstances justified a limited search without a warrant.

## II

Did the District Court's reaction to the testimony of the surviving victim prejudice the case?

Amy Rodstein was the State's principal witness at this trial. Because testifying was very difficult for her, the parties agreed that she would be questioned by her own attorney, not by the attorneys representing the State and the defendant. Amy's therapist sat with her as she testified, and recesses were called whenever Amy's counsel felt that they were needed.

At the conclusion of Amy Rodstein's testimony, she and other persons in the courtroom were in tears or nearly so. The court ordered a recess, in a voice which "cracked or wavered." The defense argues that the court's facial expression and demeanor also conveyed strong emotion. The next morning, the defendant moved for a mistrial because of the possible effect of the court's actions and demeanor upon the jury. The court denied the motion.

Defendant, as do all criminal defendants, had a constitutional right to trial by an impartial jury. Mont. Const., Art. II, Secs. 24 and 26; U.S.Const. amend. VI. To avoid prejudice to the defendant, the judge in a criminal trial should avoid making remarks which are calculated in any way

11

to influence the minds of the jury. State v. Fuller (1906), 34 Mont. 12, 26, 85 P. 369, 374. However, "it is not every remark so made that may be alleged as ground of error." Fuller, 85 P. at 374. To reverse a lower court's ruling on a motion for mistrial, this Court must be presented with evidence that is clear, convincing, and practically free from doubt that the trial court's ruling was erroneous. Schmoyer v. Bourdeau (1966), 148 Mont. 340, 343, 420 P.2d 316, 317-18.

The transcript does not convey any potential prejudice by the court. The defense's argument hinges on the tone of voice and emotional content in which the order for a recess was delivered. Defendant relies upon the county attorney's statement at the mistrial motion to support his claim. The county attorney stated that at most the court's conduct went to the weight of the evidence. That, of course, is only the county attorney's off-the-cuff remark. The lower court heard the arguments of both sides on this issue, and, especially in this case, was in a much better position than are we to judge whether the jury might have been prejudiced. We cannot conclude that the court's ruling denying a mistrial was clearly erroneous. We hold that the denial of a mistrial was not error.

### III

Were the sexual paraphernalia and magazines improperly admitted into evidence?

The State introduced into evidence at trial six pornographic magazines and two plastic artificial penises or dildoes found in Room 151. Two of the magazines were found tucked between drawers of a dresser in the room. The other materials were in the duffel bag which the defendant carried when he first approached Amy Rodstein. The defense's motion in limine prior to trial to exclude all of these items was denied. The court reasoned that although no sexual crime had

12

been charged, the State was not prohibited from pursuing a sexual motive theory at trial. The defense objected at trial to the admission of the two magazines found between the drawers on the basis that they were irrelevant, or, if relevant, that their relevance was outweighed by their prejudicial effect. That motion was also denied. The defense argues that no sexual crime was charged and no sexual motive theory was presented.

Absent abuse of discretion, this Court will uphold a district court's weighing of the potential prejudice of a piece of evidence against its probative value. State v. Austad (1982), 197 Mont. 70, 83, 641 P.2d 1373, 1380. We note in considering the relevance of the above materials that there seems to be no rational and obvious plan or purpose for these murders. A theory of a planned sexual motive, while not proven to be fulfilled, is consistent with several facts: the defendant's initial approach to Amy when she was alone, his treatment of her which was different from his treatment of the other family members, and the unfastened state of Mrs. Rodstein's clothing. These facts were brought out by the prosecution at trial. It was not necessary that the State draw the final conclusion for the jury that there may have been a sexual motive behind these crimes. The District Court ruled that these pieces of evidence were admissible to show motive, and we find no abuse of discretion in that ruling.

The District Court also ruled that these materials were admissible into evidence as part of the corpus delicti. The State is entitled to present matters closely related to the charged offense and explanatory of it as part of the corpus delicti. State v. Gillham (1983), 206 Mont. 169, 179, 670 P.2d 544, 549. We conclude that there was no abuse of discretion in the District Court's conclusion that the magazines and sexual paraphernalia were admissible as part of the

_corpus_ _delicti_ of the crimes with which the defendant was charged. We hold that admission of the sexual paraphernalia and pornography was not error.

## IV

Did the prosecutor improperly comment upon the defendant's silence?

The Fifth Amendment to the United States Constitution guarantees criminal defendants a privilege against compulsory self-incrimination. Art. II, Sec. 25 of Montana's Constitution guarantees the same right. Prosecutorial comments deny the accused this privilege when the language used is manifestly intended or is of such character that the jury would naturally and necessarily take it as a comment on the failure of the accused to testify. State v. Anderson (1970), 156 Mont. 122, 125, 476 P.2d 780, 782.

In United States v. Robinson (U.S. Feb. 24, 1988), No. 86-937, the defendant was charged with mail fraud involving arson-related insurance claims. The defense at trial, at which the defendant did not testify, was that the government had breached its "duty to be fair" by denying the defendant the opportunity to explain his actions. In the State's closing argument, the prosecuting attorney told the jury that the defendant "could have taken the stand and explained it to you." The Court held that the defendant's privilege against self-incrimination was not violated by this comment upon his failure to testify. Where the State's reference to the defendant's silence is a fair response to a claim made by the defendant or his counsel, there is no violation of the privilege against self-incrimination. Robinson, slip op. at 7.

In the present case, a witness for the defense testified at trial that some of the defendant's acquaintances were conducting a drug deal at the Airport Metra Inn on the date the Rodsteins were kidnapped. He further testified that he

14

heard one of these acquaintances say that the defendant had taken some hostages at a motel, and the other one told him to make the defendant "correct it," if necessary.

The State's attorney asked a police officer who testified at trial if "you [have] ever been able to get a statement from the Defendant." The defense objected to the question, and it was withdrawn. The officer did not answer the question. Since no answer was given, we conclude that this question about the defendant's silence was harmless.

In its closing argument, the State's attorney referred to the defendant's statement to one of the officers that, "You should have seen what he [the third person] did to that kid." The attorney then said, "Where is this guy [referring to the third person] located at in Room 151? He [the defendant] doesn't tell [the two officers] anything." This reference was clearly in response to the defense presented at trial. We conclude that this reference to the defendant's silence was admissible under Robinson.

                                    V

Was the defendant denied a jury trial as to those facts of the crime which are now denominated as aggravating circumstances, and does the evidence support the court's findings on these circumstances?

The defense discusses the right of a defendant at the common law to have a jury determine whether the crimes charged were committed with express malice. It argues that the aggravating circumstances with which the court justified the death penalties under §§ 46-18-302 to 305, MCA, are equivalent to a finding of malice. It argues that because of this historical situation, the defendant is entitled to have a jury determine the facts constituting the aggravating circumstances.

15

Regardless of the historical argument, the aggravating circumstances found against the defendant are related to sentencing only, and are not elements of the crimes charged. Jury participation is not constitutionally required in capital sentencing proceedings. State v. Smith (Mont. 1985), 705 P.2d 1087, 1106, 42 St.Rep. 463, 487, cert. denied, 474 U.S. 1073. We conclude that the defendant was not entitled to a jury determination of whether the aggravating circumstances were present in this case.

The defense also argues that the evidence does not support the court's finding that the homicides were committed by means of torture. See § 46-18-303(3), MCA: "The offense was deliberate homicide and was committed by means of torture." The defense argues that if the victims were unconscious when they were killed, they were not killed by means of torture. It also argues that the defendant's acts before the victims were rendered unconscious did not kill them, so that it cannot be said that they were killed by means of torture.

The Rodsteins were bound and gagged tightly enough that, according to the medical testimony, they would have died of suffocation if they hadn't been strangled. They were forced to see their family members similarly bound and gagged and their teenage daughter and sister taken by the defendant out of the room where they were captive. They then were forcefully injected or witnessed the injection of their family members with unknown drugs. Mr. Rodstein was strangled with sufficient force to break his voicebox. Mrs. Rodstein was hogtied, with her legs bent up behind her. Andrew Rodstein was subjected to the peculiar injuries to his chest. We hold that there is substantial evidence to support the District Court's finding that the Rodsteins were killed by means of torture.

16

Next, the defense argues that the trial judge improperly applied § 46-18-303(4), MCA: "The offense was deliberate homicide and was committed by a person lying in wait or ambush." The defense asserts that several elements required under the common law antecedent of this statute are missing: secret waiting, watching from concealment, and presence of the murder weapon during the waiting and watching.

When the defendant approached Amy Rodstein in the parking lot, he had already laid out tape and gags on a bed in his room. He approached her carrying a duffel bag from which the muzzle of a gun protruded. We conclude that it is immaterial whether the actual murder weapon, the telephone cord with which the victims were strangled, was the defendant's or the Rodsteins'. Defendant had laid out the tape and gags and had with him syringes, drugs, and the unloaded gun. We conclude that there is substantial evidence to support the District Court's finding that the deliberate homicides were committed by a person lying in wait or ambush.

VI

Did the trial court err by considering the defendant's silence at trial in imposing the death penalty?

The court's findings in its sentencing order included the following:

> The Court has had the opportunity to observe the Defendant during the entire trial and throughout all proceedings. His conduct in all proceedings has been appropriate. Scarcely a word has been spoken in the Court's presence. The complete lack of emotion and cool detachment in his demeanor has been noted throughout. As Dr. Van Hassel testified, lack of an emotional response can be a coping mechanism of denial, or a personality that shows no overt emotion normally or, finally, that the person truly is not concerned. Whatever the reason, the Defendant has demonstrated no remorse

17

or genuine concern or respect for human life to the time of sentencing.

The defense argues that this finding constitutes improper consideration of the defendant's constitutional right to remain silent. It argues that the case should be remanded for resentencing without consideration of this factor, because the defendant would have to give up his right to remain silent in order to show remorse.

The scope of matters which a court may consider in sentencing goes beyond matters admissible in a criminal trial. Section 46-18-302, MCA. The above finding could express absence of a mitigating factor. In any event, we conclude that the presence of this finding is not significant because of the presence of several other findings warranting imposition of the death penalty.

## VII

Did the sentencing judge improperly consider the victim impact statement and characteristics of the victim?

The presentence investigation report given to the judge prior to sentencing contained a three-paragraph "victim's impact statement" which stated that three of the four members of the Rodsteins' immediate family are deceased as a result of this crime. It also stated that Amy was undergoing psychological counseling and gave the cost of that counseling. Further it stated that Amy's performance at the time the report was written had been described by her therapist as "not doing so well."

The defense argues that under Booth v. Maryland (1987), 482 U.S. ___, 107 S.Ct. 2529, 96 L.Ed.2d 440, the District Court's receipt and consideration of evidence of the effect of the crime upon the Rodsteins, and upon Amy Rodstein in particular, violates the Eighth Amendment. It asserts that resentencing is required because of this error.

18

As was true in State v. Keith (Mont. 1988), 754 P.2d 474, 487-88, 45 St.Rep. 556, 573-75, the situation in this case differs from that in <u>Booth</u> in several particulars. Sentencing in this case was by the court, not by jury as in <u>Booth</u>. The victim impact statement here consisted of three paragraphs. In <u>Booth</u> the victim impact statement was a lengthy and poignant collection of statements by the victims' surviving family. We conclude as we did in <u>Keith</u> that <u>Booth</u> is not controlling because of important factual distinctions. We hold that the sentencing judge properly considered the victim impact statement and the characteristics of the victims.

## VIII

Should a jury have participated in the sentencing process?

The defense concedes that both this Court and the United States Supreme Court have ruled that death penalty sentencing need not be done by a jury to be constitutionally sound. State v. Smith (Mont. 1985), 705 P.2d 1087, 1105-06, 42 St.Rep. 463, 486-87, cert. denied, 474 U.S. 1073; Proffitt v. Florida (1976), 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913, 922-23. It argues perfunctorily that since the Montana Legislature meets only in alternate years, jury participation in death penalty sentencing is important so that current community sentiment is expressed.

We decline the defense's invitation to overrule <u>Smith</u> and distinguish <u>Proffitt</u>. We again hold that a jury need not be the sentencing body where the death penalty is imposed.

## IX

Should the absence of a prior criminal history on the part of the defendant be treated as sufficiently substantial to warrant leniency?

In its sentencing order, the court found that one statutory mitigating circumstance under § 46-18-304, MCA, was present: the defendant had no significant history of prior criminal activity. Section 46-18-304(1), MCA. The defense argues that the presence of this mitigating factor is sufficient to warrant leniency.

We have previously rejected the proposition set forth by the defense. State v. Smith (Mont. 1985), 705 P.2d 1087, 1097, 42 St.Rep. 463, 476, cert. denied, 474 U.S. 1073; State v. Coleman (1979), 185 Mont. 299, 331-32, 605 P.2d 1000, 1019-20, cert. denied, 446 U.S. 970. Here we again conclude that it was not error for the District Court to refuse leniency when the nature of the crimes of which the defendant has been convicted is weighed against his lack of a significant prior criminal history.

X

Does § 46-18-305, MCA, violate the Eighth Amendment?

The defense argues that § 46-18-305, MCA, allows the imposition of cruel and unusual punishment because it does not sufficiently narrow the class of death-eligible defendants. That statute provides:

> Effect of aggravating and mitigating circumstances. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 46-18-303 and 46-18-304 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 46-18-303 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.

The defense acknowledges that its argument has previously been rejected by this Court. See State v. McKenzie (1980), 186 Mont. 481, 514-19, 608 P.2d 428, 448-51, cert. denied, 474 U.S. 1073. We affirm our holding from McKenzie.

XI

Review of the sentence under § 46-18-310, MCA.

Under § 46-18-310, MCA, this Court, in reviewing a death sentence, must determine 1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; 2) whether the evidence supports the judge's findings on any mitigating and aggravating circumstances; and 3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

As to the first determination, the defense has not argued that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Issue VII does discuss and rule upon a related issue with regard to the victim impact statement. We have reviewed the record and conclude that there is no indication in that record that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

The second determination requires this Court to consider whether the evidence supports the judge's findings of the existence of aggravating and mitigating circumstances as enumerated in the statute. We have made a determination on two of the aggravating circumstances under Issue V. The other two aggravating circumstances found by the District Court are that the offenses were deliberate homicides committed as part of a plan or scheme whereby more than one person would die, and that the offenses were aggravated kidnappings resulting in the deaths of the victims. Sections

21

46-18-303(5) and (7), MCA. Clearly, the evidence supports both of those findings.

Last we are to determine whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendants. No argument has been made on this issue by the defendant. However, in accordance with our statutory duty, we have considered the five Montana death penalty cases since 1973. The facts of these cases are discussed in Keith, 754 P.2d at 480-81.

The crimes in this case extended over a number of hours, including the kidnapping of the four persons, the binding and gagging of the persons, the injection of substances into Mr. and Mrs. Rodstein, the subsequent strangulation of Mr. and Mrs. Rodstein with the telephone cord, the giving of a liquid to 11-year old Andrew Rodstein in order to make him sleep, and the strangling of Andrew. The defendant gave Amy a similar liquid to drink but because she poured it out when the defendant was not looking she may have been protected from her own deliberate homicide. As previously discussed, the deliberate homicides were committed by means of torture and by the defendant lying in wait or ambush. As discussed above, the aggravating circumstances also include that the offenses were deliberate homicides committed as a part of a scheme or operation which resulted in the deaths of three persons, including the 11-year old, and that the offenses of aggravated kidnapping resulted in the deaths of the victims.

We have considered the crimes and the defendants in each of the cases discussed in Keith and compared the same to the crimes and the defendant in the present case. In comparing the crimes, we conclude that the crimes committed by the defendant were at least as grievous and heinous as were those involved in the other described death penalty cases. We also

22

conclude, after considering the defendants in each of the cases cited in <u>Keith</u>, that the defendant's lack of a prior criminal history, when weighed against the nature of the crimes of which he was convicted, does not make his sentence disproportionate in comparison with the other cases. Finally, we have considered State v. Keefe (Mont. 1988), ___ P.2d ___, 45 St.Rep. 1034, in which the defendant was not sentenced to death although he was convicted of the deliberate homicides of three family members in their home. However, that defendant was under the age of 18 at the time the crimes were committed.

We hold that the sentences of death given in the present case are not excessive or disproportionate to the penalty imposed in similar cases in Montana, considering both the crimes and the defendants. As required by § 46-18-310, MCA, in reaching this conclusion, we have considered the punishment as well as any errors enumerated by way of appeal.

We affirm the judgment of the District Court. This cause is remanded to the District Court for the setting of an execution date.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

23

William E Hurth

R. C. McDonough
Justices

24