No. 88-443

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

LESTER KILLS ON TOP,

        Defendant and Appellant.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and for the County of Custer,
The Honorable H. R. Obert, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Stephen C. Moses argued; Moses Law Firm, Billings,
Montana

    For Respondent:

        Hon. Marc Racicot, Attorney General, Helena, Montana
Clay R. Smith argued, Solicitor, Helena, Montana
Keith D. Haker, County Attorney, Miles City, Montana

Submitted: October 19, 1989

Decided: February 15, 1990

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Lester Kills on Top was convicted by jury in the Sixteenth Judicial District Court, Custer County, Montana, of robbery, aggravated kidnapping and deliberate homicide. He was sentenced to 40 years for robbery. He received the death penalty for each of the latter two convictions. Defendant appeals both the convictions and the sentences. We affirm.

The issues presented for our review are:

1. Whether the District Court had jurisdiction over the crimes for which the defendant was convicted.

2. Whether the District Court committed prejudicial error in ordering the defendant to disclose to the State any statements taken from individuals identified by the latter as possible witnesses.

3. Whether the District Court committed prejudicial error by admitting into evidence various exhibits.

4. Whether the District Court committed prejudicial error in refusing to give instructions offered by the defendant relating to lesser included offenses of aggravated kidnapping, in refusing to give defendant's instruction on accomplice testimony corroboration, and in giving an instruction relating to flight offered by the State.

5. Whether certain factual findings in the District Court's sentencing order were supported by the evidence.

6. Whether imposition of the death penalty is constitutional under the mandatory review criteria of § 46-18-310, MCA.

7. Whether the sentencing court committed prejudicial error in its consideration of victim impact statements.

8. Supreme Court sentence review pursuant to § 46-18-310, MCA.

9. Whether the present death penalty constitutes cruel and unusual punishment prohibited by the United States and Montana Constitutions.

The events leading to the death of John Martin Etchemendy, Jr., began in the early morning hours of October 17, 1987. All offenses are alleged to have occurred on October 17. The trial in this case lasted two and one-half weeks. The State presented over fifty witnesses and the defense presented eight witnesses. Defendant did not testify. Over one hundred exhibits were entered into evidence.

Defendant, Lester Kills on Top, and his brother, Vernon Kills on Top, entered the Golden West Bar in Miles City, Montana, some time after midnight on October 17, 1987. Accompanying them were Diane Bull Coming and Doretta Four Bear. Mr. Etchemendy, along with a friend, also went to that bar on that Friday evening. When Mr. Etchemendy was ready to leave the bar, he went out to the parking lot but was unable to locate his vehicle. At that point defendant, his brother, and the two women offered to help him. They all got in a black Dodge Duster. First the group turned on to Highway 59 and looked a few places for Mr. Etchemendy's car. Then, rather than proceeding north to Miles City, they went south toward Ashland. Diane Bull Coming testified that defendant said, in his native tongue of Northern Cheyenne, that they should "roll him and steal from him." Shortly after this statement, the car stopped so the men could urinate. Although Mr. Etchemendy and defendant began arguing, Mr. Etchemendy voluntarily got back in the car.

The car continued to proceed south on Highway 59, then turned southwest onto Highway 332 toward Ashland and the Northern Cheyenne reservation. Defendant began assaulting Mr. Etchemendy in the back seat, both beating and choking him, and attempting to force some pills down his throat.

3

Doretta Four Bear testified that during the assault, Diane Bull Coming took the wallet from Mr. Etchemendy's pocket and rifled through it. Mr. Etchemendy was also ordered to empty his pockets. From his wallet, the group obtained credit cards and two checks issued to Mr. Etchemendy from his employer. While the car was traveling over the unpaved portion of Highway 332, the driver, Diane Bull Coming, was told to stop the car. The brothers took Mr. Etchemendy out of the car and again assaulted him. After making him totally undress, they put him in the trunk of the car. All this occurred before they entered the reservation.

Near Ashland, at about 5 a.m., they picked up Lavonne Quiroz. Vernon and Ms. Quiroz attempted to siphon gas from some local pickups. They then drove to Rabbit Town where they stole a tool box. Doretta Four Bear was frightened of the group's activities and took this opportunity to flee to a friend's house. The group used one of Mr. Etchemendy's credit cards to purchase gas in Ashland. They next drove to Broadus.

At Broadus, which is off the reservation, defendant cashed one of Mr. Etchemendy's paychecks for $179.31. After sharing the money with Vernon, defendant used some of it to buy alcohol (called Ever-Clear). At the suggestion of Diane Bull Coming, the group decided to drive south to Gillette, Wyoming.

The car turned off on a side road from Highway 59 and stopped. Mr. Etchemendy was let out of the truck, but defendant held a metal pipe and warned him he would be beaten if he tried to flee. Mr. Etchemendy had been blindfolded but Vernon took the blindfold off at this point. Defendant then became concerned that Mr. Etchemendy could identify them. Defendant forced Mr. Etchemendy to drink a mixture of beer and Ever-Clear, evidently in an effort to make him pass out.

4

He was then put back in the trunk. This occurred off the reservation.

The group continued on to Biddle, Wyoming, and arrived there about 11 a.m. There they cashed Mr. Etchemendy's second paycheck. As they continued to travel south, the car stopped twice. During one stop defendant, while again holding the metal pipe, told Mr. Etchemendy he would die if he opened his eyes. Back in the car, defendant spoke to Mr. Etchemendy through the back seat. Mr. Etchemendy informed defendant that he was married and had two sons.

At Gillette, Wyoming, Vernon used Mr. Etchemendy's credit card to buy gas. They gave Mr. Etchemendy another drink mixed with Ever-Clear. Diane Bull Coming testified that while in the town of Gillette, Mr. Etchemendy began pounding on the trunk and calling for help. Defendant spoke in his native language and told Vernon they would have to kill Mr. Etchemendy. Vernon and Ms. Quiroz remained in a bar while defendant and Diane Bull Coming left in the car.

Defendant and Diane Bull Coming left Gillette, turned onto a side road, and stopped when they were not visible from the main road. Ms. Bull Coming testified that defendant took the pipe, opened the trunk, and began striking Mr. Etchemendy with the pipe, a tire iron, and finally a rock. He also kicked him with his boots. She testified that during this assault the victim cried out, "Oh God, no, God, no!" Ms. Bull Coming testified that after the beating defendant threw the pipe and tire iron into a field, got back into the car and they drove off. After driving a short distance, defendant told Ms. Bull Coming to stop the car so he could shoot Mr. Etchemendy. He then attempted to shoot the victim by placing a .22 caliber shell in a vise grip and hitting the shell with a hammer.

5

Defendant and Ms. Bull Coming drove on but had two flat tires and were forced to stop at a lounge outside of Gillette, Wyoming. Here, Ms. Bull Coming testified that she saw defendant attempting to cut Mr. Etchemendy's throat with a small knife. She stated that she went into the lounge and defendant later came in and said the victim was dead.

About 5 p.m. Vernon and Ms. Quiroz joined defendant and Ms. Bull Coming. They purchased new tires and then traveled toward Buffalo, Wyoming. Before leaving Campbell County, Wyoming, they left the body at an abandoned community hall approximately twenty miles south of Gillette.

A rancher who lived in the area was driving by with his stepson and noticed the car parked by the community hall. He testified that he saw three people walk over to the car, shut the trunk, get in and drive off. He testified that they failed to shut a gate so he drove after them, blinking his lights, and finally stopping sideways in the road in front of them to force a stop. Noting that the car had a Montana license plate, he wrote down the license number. When he told the group to return and close the gate, he stated that they agreed to do so. LaVonne Quiroz testified that they drove back to the gate, whereupon she and defendant got out of the car and closed the gate.

When the group stopped in Sheridan, Wyoming, to get a motel, Vernon and Ms. Quiroz took off in the car, leaving defendant and Ms. Bull Coming behind. Defendant and Ms. Bull Coming went to a store in Sheridan and purchased new clothes with one of the credit cards. Defendant also attempted to purchase new boots at a different store, but the salesperson could not accept the credit card. At a truck stop defendant and Diane Bull Coming changed their clothing and threw away the clothes they were wearing. They then hitchhiked to Billings, Montana, using fictitious names.

On October 19, defendant was arrested in Billings at the home of Lorraine Four Colors. Prior to being arrested, defendant and Ms. Bull Coming related the incident to Lorraine Four Colors. When defendant learned that his brother, Vernon, had been arrested he directed Ms. Bull Coming to destroy the credit cards.

On October 19, the body of the victim was located by law enforcement officers in the community hall near Gillette, Wyoming. An autopsy established that the cause of death was impact trauma to the back and left side of the victim's head.

I

Whether the District Court had jurisdiction over the crimes for which the defendant was convicted.

In a pretrial motion to dismiss, defendant contended that Montana lacked jurisdiction to prosecute these offenses. This motion was briefed and argued by the parties. The District Court denied this motion.

On appeal, defendant contends that Montana lacks jurisdiction to prosecute these crimes for two reasons. First, he contends that jurisdiction to prosecute the deliberate homicide was properly in the State of Wyoming rather than Montana. Second, defendant contends that federal jurisdiction is exclusive pursuant to the Major Crimes Act, 18 U.S.C. § 1153, because defendant is a full-blooded, enrolled member of the Northern Cheyenne Tribe, and also the offenses occurred "within Indian Country." We will address each jurisdictional issue separately.

The statute governing State jurisdiction for a criminal offense is § 46-2-101, MCA, which provides in pertinent part:

> (1) A person is subject to prosecution in this state for an offense which he commits while either within or outside the state by his own conduct or

7

that of another for which he is legally accountable if:

> (a) the offense is committed either wholly or partly within the state[.]
>
> * * *
>
> (2) An offense is committed partly within this state if either the conduct which is an element of the offense or the result which is an element occurs within the state.

Pursuant to § 46-2-101, MCA, Montana has jurisdiction if the offense is committed "partly within" the state. This Court has previously construed this statute in State v. White (Mont. 1988), 750 P.2d 440, 441, 45 St.Rep. 270, 272-73, as a "broad assertion of jurisdiction." See also State v. Bush (1981), 195 Mont. 475, 477-78, 636 P.2d 849, 851. Analyzing the elements of each of the three offenses for which defendant was convicted, it is clear that an element of each offense occurred off the reservation, and was committed "partly within" Montana.

Defendant was convicted of robbery, described in § 45-5-401, MCA, as follows:

> Robbery. (1) A person commits the offense of robbery if in the course of committing a theft he:
> (a) inflicts bodily injury upon another[.]

Theft is defined in § 45-6-301, MCA, which provides:

> Theft. (1) A person commits the offense of theft when he purposely or knowingly obtains or exerts unauthorized control over property of the owner and:
> (a) has the purpose of depriving the owner of the property[.]

In the present case the testimony established that Diane Bull Coming took Mr. Etchemendy's wallet containing credit

8

cards and two employment checks, while defendant inflicted bodily injury upon Mr. Etchemendy. Undisputed testimony demonstrated that this action occurred on the Tongue River Road, several miles before the group entered the reservation. While the testimony does establish that defendant did not initially take Mr. Etchemendy's wallet from him, the uncontradicted evidence establishes that the defendant exerted unauthorized control over the property of Mr. Etchemendy when he cashed the Etchemendy payroll check at a bar in Broadus, Montana.

Additionally, one may be convicted of the offense of robbery even though he did not actually take the property himself, if he was a participant in the crime. See State v. Ortega (1984), 209 Mont. 285, 290-91, 679 P.2d 793, 796; State v. Hart (Mont. 1981), 625 P.2d 21, 30, 38 St.Rep. 133, 142.

We conclude that the uncontradicted evidence established that elements of the crime of robbery were committed within the State of Montana and off the Indian Reservation. We affirm the District Court's denial of the motion to dismiss the robbery for lack of state jurisdiction.

Defendant was convicted of aggravated kidnapping pursuant to § 45-5-303(1)(c), MCA, which provides:

> Aggravated kidnapping. (1) A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation or by using or threatening to use physical force, with any of the following purposes:
>
> * * *
>
> (c) to inflict bodily injury on or to terrorize the victim or another[.]

9

Again, it is clear that Mr. Etchemendy was both restrained and beaten by defendant within Montana before the group entered the reservation. Defendant's physical restraint and infliction of bodily injury upon Mr. Etchemendy in the back seat of the car began well before the group entered the reservation. Diane Bull Coming and Doretta Four Bear both testified that shortly thereafter and before entering the reservation, the car stopped and defendant and his brother assaulted the victim outside the car. Then, rather than placing him back in the car, they ordered him to strip, and placed him in the trunk of the car. Boxer shorts, identified at trial as belonging to the victim, were found near Highway 332 in Custer County, approximately two miles before the border of Rosebud County, and off the reservation. This evidence corroborates the testimony as to where the victim was placed in the trunk. The evidence clearly establishes that all elements of the aggravated kidnapping were satisfied in Montana, off the reservation. We affirm the District Court's denial of defendant's motion to dismiss the aggravated kidnapping for lack of state jurisdiction.

Defendant was also convicted of deliberate homicide under the "felony murder rule." Section 45-5-102(1)(b), MCA, codifies the felony murder rule, providing:

> Deliberate homicide. (1) A person commits the offense of deliberate homicide if:
>
> . . .
>
> (b) he attempts to commit, commits, or is legally accountable for the attempt or commission of robbery, sexual intercourse without consent, arson, burglary, kidnapping, aggravated kidnapping, felonious escape, felony assault, aggravated assault, or any other forcible felony and in the course of the forcible felony or flight thereafter,

10

> he or any person legally accountable for the crime
> causes the death of another human being.

Under the "felony murder rule" it is not necessary to prove the "purposely or knowingly" element of the crime of deliberate homicide. State v. Nichols (1987), 225 Mont. 438, 449-50, 734 P.2d 170, 176-77; State v. Sunday (1980), 187 Mont. 292, 307, 609 P.2d 1188, 1197. Rather, the intent to commit the underlying felony replaces this element.

In State ex rel. Murphy v. McKinnon (1976), 171 Mont. 120, 556 P.2d 906, we stated that "for the felony murder rule to apply a causal connection between the felonious act and the death must be present." McKinnon, 556 P.2d at 910. Therefore, in the present case the elements the State had to prove were:

1) the commission of the felony
2) that a death occurred
3) a causal connection between the first felony and the death.

As previously established, the first element of the deliberate homicide, the commission of the underlying felony of aggravated kidnapping, occurred in Montana. The causal connection element was also satisfied by Montana-based conduct. Only the actual death occurred in Wyoming.

Defendant however, urges that Wyoming has jurisdiction over the deliberate homicide since the decision to kill the victim occurred in Wyoming. Defendant presents a rather convoluted argument in support of this theory which we will attempt to summarize. Defendant was convicted of deliberate homicide under the felony murder rule, which does not require that the homicide be intentional. Defendant contends, however, that in reality the homicide was intentional and therefore did not flow from the kidnapping. He urges that the

11

homicide was a distinct offense and that all elements of the homicide occurred in Wyoming.

We reject this argument since defendant was charged with deliberate homicide under the felony murder rule, the jury was instructed on this offense, and the jury in fact found him guilty as charged. Defendant's attempt to re-define the requisite elements of the homicide in this case in order to support this jurisdictional contention has little merit.

Additionally, defendant misconstrues the requirements of the offense of felony murder. It appears defendant is arguing he cannot be convicted of deliberate homicide under the felony murder rule if the killing was intentional. The felony murder statute only eliminates the necessity that the State prove the defendant knowingly or purposely killed Mr. Etchemendy. That statute does not suggest that if in fact the defendant knowingly or purposely killed Mr. Etchemendy, somehow the defendant cannot be found guilty of deliberate homicide under the felony murder rule. The evidence in this case clearly establishes the commission of aggravated kidnapping in Montana, the death in Wyoming, and a causal connection between the aggravated kidnapping and death. We conclude that the statutory requirements under § 46-2-101, MCA, were met. We affirm the District Court's denial of defendant's motion to dismiss the deliberate homicide based on lack of State jurisdiction.

As a second jurisdictional issue, defendant contends that pursuant to the Major Crimes Act, federal jurisdiction is exclusive. The Major Crimes Act, 18 U.S.C. § 1153 provides:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A,

12

incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

In the present case the critical language of this statute is "within the Indian country." An Indian committing one of the enumerated crimes within Indian country is subject to federal jurisdiction. The issue of State jurisdiction over an Indian defendant is resolved factually in the present case. As previously established, elements of the crimes of robbery, aggravated kidnapping, and deliberate homicide were satisfied within Montana and outside of Indian country.

Defendant seems to be claiming that if any part of an offense occurs within Indian country, the State has no jurisdiction. However, this is not the law. The State has jurisdiction for off-reservation offenses even though a connected offense may occur within Indian country. See, e.g., State v. Rossbach (Minn. 1980), 288 N.W.2d 714 (state had jurisdiction where Indian defendant, standing inside reservation, fired rifle across boundary of reservation at a deputy sheriff standing on Minnesota land); State v. Wickler (S.D. 1977), 260 N.W.2d 356 (state had jurisdiction to prosecute seven Indian defendants who fired shots from reservation onto state land). See also 41 Am.Jr.2d Indians § 67 (1968), stating: ". . . Indians are amenable to state laws for offenses against such laws committed by them off the reservation within the limits of the state, . . ." While it is true that the victim was taken onto the reservation during the course of the kidnapping, in fact, crossing the reservation three times, this journey through the reservation does not deprive the State of its jurisdiction.

13

Defendant relies on United States v. Torres (7th Cir. 1984), 733 F.2d 449, cert. denied, 469 U.S. 864 (1984), as authority for his contention that federal jurisdiction is exclusive. In Torres, federal jurisdiction attached where the "major portion" of an ongoing conspiracy to "get rid of the victim" occurred on the reservation, even though defendants began to formulate the conspiracy, and abducted the victim outside the reservation. Torres, 733 F.2d at 460. The present case is factually distinguishable from Torres since only a minor portion of the crimes occurred on the reservation. Torres does not foreclose state jurisdiction.

We conclude that Montana had jurisdiction to prosecute all three charged offenses as required under § 46-2-101, MCA. We affirm the District Court's denial of the motion to dismiss based on lack of jurisdiction.

II

Whether the District Court committed prejudicial error in ordering the defendant to disclose to the State any statements taken from individuals identified by the latter as possible witnesses.

At an omnibus hearing on March 25, 1988, the court granted the State's request that defendant produce copies of statements made by individuals whom the defendant intended to call as witnesses at trial. At a pretrial hearing on May 31, 1988, defendant refused to produce certain statements taken by his own investigator from witnesses for the State. On June 1, 1988, the State filed a motion to compel discovery of all witnesses defendant intended to call at trial. That motion was granted. The court ordered production pursuant to § 46-15-323(4), MCA, which provides:

> (4) Simultaneously with the notice of defenses submitted under subsection (3), the defendant

14

shall make available to the prosecutor for testing, examination, or production:

 (a) the names and addresses of all persons, other than the accused, whom he will call as witnesses at trial, together with all statements made by them in connection with the particular case;

 (b) the names and addresses of experts whom he will call at trial, together with the results of their physical examinations, scientific tests, experiments, or comparisons, including all written reports and statements made by them in connection with the particular case; and

 (c) a list of all papers, documents, photographs, and other tangible objects that he will use at trial.

Defendant challenges the court's order on two bases. He first makes a constitutional challenge to this statute, contending that the statute violates the Fifth Amendment in that it may require him to provide proof necessary to convict himself. He urges that statements he has taken from these witnesses may inadvertently supply corroborating testimony which the State is lacking. He also argues that he should not be required to produce these statements prior to trial since a criminal defendant is not required to produce any witnesses and because a criminal defendant may not make the decision of whether to call witnesses until after the State has presented its case. Defendant also claims this statute violates the work product rule.

The same argument regarding this statute was addressed in State ex rel. Carkulis v. Dist. Ct. of Thirteenth Jud. D. (Mont. 1988), 746 P.2d 604, 44 St.Rep. 1954, wherein we upheld the validity of § 46-15-323, MCA, both against a constitutional challenge and a claim that it violated the work product doctrine. In Carkulis, we began by noting the rationale stated in Williams v. Florida (1970), 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446, as follows:

15

> The United States Supreme Court in Williams v. Florida (1970), 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446, upheld a state statute requiring the disclosure of an alibi defense and alibi witnesses to the state prior to trial as not violating the federal right against self-incrimination. Williams is essentially grounded on the "accelerated disclosure" theory, that is, that at trial, the defendant would have to reveal his alibi and his witnesses relating thereto, and that accelerating the disclosure does not affect his constitutional rights against self-incrimination.

Carkulis, 746 P.2d at 608.

In Carkulis, after approving the Williams rationale, we went on to apply the accelerated disclosure theory to the disclosure required in a defendant's general defense. We reasoned that if defendant intended to call certain witnesses at trial, requiring pretrial disclosure of the statement did not violate Fifth Amendment rights. We reaffirm the constitutionality of § 46-15-323(4), MCA, as here applied.

In the present case, defendant also predicates his claim of error on the fact that he was required to produce statements taken from witnesses for the State. Since the statute and our holding in Carkulis only require production of statements of witnesses which the defendant will call at trial, he claims this was error.

Defendant's contentions fail for three reasons. First, defendant did not request a protective order for these statements, which he could have done pursuant to § 46-15-328, MCA. Second, although defendant emphasizes that these statements were taken from the State's witnesses, defendant listed all State witnesses on his own list of witnesses. Thus the statements are precisely those which are required to be produced pursuant to § 46-15-323(4), MCA. As a final comment, the record fails to demonstrate any manner in which defendant was prejudiced by the production of these

16

statements. The District Court record does not contain the statements at issue, and defendant made no offer of proof as to their alleged prejudicial nature. Defendant's argument in regard to the witness statements is thus only academic in nature, failing both factually and legally. We affirm the order by the District Court which required production of the witness statements.

## III

Whether the District Court committed prejudicial error by admitting into evidence various exhibits.

Defendant objects to the introduction at trial of several pieces of evidence. Specifically, he objects to the introduction of the red tool box, three items of defendant's clothing, the pipe and photographs of it, the vice grip and an associated residue swab, and photographs of the victim's body where it was found in the abandoned community hall. He bases these alleged errors on arguments of relevance and prejudice.

An exhibit must be relevant to be entered at trial, and a district court has broad discretion in determining relevance. State v. Oman (1985), 218 Mont. 260, 264, 707 P.2d 1117, 1119. Relevance is defined in Rule 401, M.R.Evid., as follows:

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.

In Oman, we discussed relevance as follows:

> The test of relevance is whether an item of evidence will have any value, as determined by logic and experience, in proving the proposition for

17

> which it is offered. Generally, whatever naturally
> and logically tends to establish a fact in issue is
> relevant, and that which fails to qualify in this
> respect is not relevant. (Citation omitted.)

Oman, 707 P.2d at 1119.

In the present case the State relied on accomplice testimony, which must be corroborated pursuant to § 46-16-213, MCA. In substance, this statute provides that accomplice testimony cannot sustain a conviction unless it is independently corroborated by other evidence which tends to connect the defendant to the crime. Having reviewed the evidence presented at trial, we conclude that the items of evidence to which defendant now objects were relevant in that each item independently corroborated the testimony of one of the accomplices.

Defendant contends that the admission of the tool box was irrelevant and was prejudicial as evidence of another crime. The tool box was relevant however, as corroborating the testimony of Doretta Four Bear regarding the sequence of events in Ashland and Rabbit Town. Additionally, the State was entitled to introduce the tool box even though it disclosed a crime other than the crimes charged, since it was a part of the corpus delecti and was inextricably related to the entire transaction. State v. Riley (1982), 199 Mont. 413, 425-26, 649 P.2d 1273, 1279.

Defendant objected to the introduction of a pipe and photographs of it, claiming that there was insufficient foundation. He claims that testimony by Officer Steve Hamilton indicated that the pipe was not in the same condition at trial as when it was found. At trial, Officer Hamilton testified that on October 20, 1987, he and another officer went to the location where the homicide was alleged to have occurred. While searching the area they found a pipe which

18

appeared to have blood on it. The officer acknowledged at trial that the pipe had been wiped clean, yet positively identified it as the one they had found. Diane Bull Coming testified that defendant hit the victim with a pipe, and LaVonne Quiroz testified that the pipe was similar to the one with which defendant threatened the victim at one of the stops. The pipe was certainly relevant evidence, and was identified through trial testimony as the one found by the officers. We conclude the court did not err in admitting the pipe and related photographs.

Defendant contends that the vice grips and a related residue swab should not have been admitted since no evidence of a bullet discharge links these to the crime. However, the testimony of Diane Bull Coming linked these to the crime. Defendant also contends these created the impression of viciousness and were therefore prejudicial. We see little merit to this contention. Other evidence established the viciousness of the crimes. The vice grips added little to this.

Defendant objects to the admission of the clothes he was wearing when he was arrested. The shirt and jeans were new, but the boots were not new, and had some blood stains on them. These items served to corroborate the testimony by Diane Bull Coming that defendant purchased new clothes in Wyoming and threw away the blood-stained clothes he was wearing. She also testified that he attempted to purchase new boots in Sheridan, Wyoming, but was unsuccessful.

Photographs of the abandoned community hall were admitted, two of which were close-ups of the upper body of the victim, and a third photo showed the victim's upper body from a few feet away. Defendant claims that these were not necessary to prove any issue and were highly inflammatory. The photographs showed the upper body, head, and right arm of the

19

victim. The photographs were relevant to corroborate the testimony regarding the assaults upon Mr. Etchemendy as well as the death. The photographs corroborated testimony of Diane Bull Coming as to where the body was left, and the testimony of the rancher, who saw the car parked at the community hall. Additionally, the photographs did not show the left side of the victim's head, which was the side sustaining the actual blows. We have previously held that if relevant, the inflammatory nature of a photograph of the victim does not necessarily outweigh the probative value. State v. Siglar (1984), 210 Mont. 248, 256, 688 P.2d 749, 753 (holding that the jury was entitled to know the nature and extent of the injuries and no method other than the photographs would demonstrate this as graphically or as well); Riley, 649 P.2d at 1280-81 (holding that photos were reasonably necessary to depict the multiplicity and extent of injuries). We conclude the photographs were relevant and not unduly inflammatory.

We conclude that none of defendant's evidentiary objections are meritorious.

IV

Whether the District Court committed prejudicial error in refusing to give instructions offered by the defendant relating to lesser included offenses of aggravated kidnapping, in refusing to give defendant's instruction on accomplice testimony corroboration, and in giving an instruction relating to flight offered by the State.

The court instructed the jury on the elements of aggravated kidnapping. Defendant contends that he was entitled to instructions on the lesser included offenses of unlawful restraint and kidnapping. He urges that the jury must be instructed on lesser included offenses if there is "some

evidence" to support the lesser offense, citing State v. Hamilton (1980), 185 Mont. 522, 605 P.2d 1121.

We have previously stated the test regarding the court's duty to instruct the jury on lesser included offenses, as follows:

> It is a fundamental rule that the defendant is entitled to an instruction on a lesser included offense if the evidence would enable the jury rationally to find him guilty of a lesser offense and to acquit him of the greater. Keeble v. United States (1973), 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844, 847. But this Court has held that the District Court will not be put in error for refusing to instruct as to the lesser included offense, if the evidence is such to show that the defendant is either guilty of the offense charged or entitled to an acquittal. (Citations omitted.)

State v. Kyle (Mont. 1980), 628 P.2d 260, 263, 37 St.Rep. 1447, 1451. See also State v. Ballenger (1987), 227 Mont. 308, 312, 738 P.2d 1291, 1294 (court properly refused instructions on aggravated assault and felony assault where evidence demonstrated calculated, relentless beatings of child, resulting in child's death); State v. Farrell (1984), 207 Mont. 483, 491, 676 P.2d 168, 172-73 (court properly refused instruction on misdemeanor theft where evidence showed that amounts received by defendant were over $150, and no rational trier of fact could have found defendant guilty of misdemeanor theft); State v. Radi (1978), 176 Mont. 451, 464, 578 P.2d 1169, 1177 (court properly refused instruction on lesser included offense of criminal trespass where no evidence could lead a jury to believe defendant was in building for an innocent purpose).

Unlawful restraint is committed when a person "knowingly or purposely and without lawful authority restrains another so as to interfere substantially with his liberty." Section

45-5-301(1), MCA. Kidnapping is committed when unlawful restraint is effected "by either secreting or holding [the victim] in a place of isolation or by using or threatening to use physical force." Section 45-5-302(1), MCA. Defendant was charged with aggravated kidnapping, committed with a purpose to inflict bodily injury or terrorize the victim. In the present case, defendant was not entitled to an instruction on unlawful restraint unless there was evidence that the victim was not restrained by secreting him or by using force. He would have been entitled to an instruction on kidnapping only if there was evidence that no purpose to inflict bodily injury or terrorize the victim existed. There is no evidence in the record that the restraint of the victim was not accompanied by the use of force. Neither is there evidence of a kidnapping without a purpose of inflicting bodily injury or terrorizing the victim. The evidence would not reasonably support the lesser included offenses. We conclude that defendant was not entitled to an instruction on these lesser included offenses.

Defendant also contends that his instructions regarding accomplice testimony should have been given, rather than the instructions which were given. The court's Instruction No. 23 instructed the jury on accomplice testimony.[1] Defendant's

---

1    Court's Instruction No. 23:
Testimony has been presented that one or more witnesses may be accomplices in this case. In this respect you are to be guided by the following rules of law:

1. An accomplice is one who knowingly and voluntarily, with common intent with the principal offender, unites in the commission of a crime. One may become an accomplice by being present and joining in the criminal act, by aiding and abetting, with criminal intent, another in its commission or in being present by advising and encouraging its commission, but

instructions, Numbers 13, 16, 17 and 31, which he contends should have been given, were either redundant or not relevant to accomplice testimony. Defendant's Instruction No. 13 described mental state; Instruction No. 16 dealt with the concept of accountability; Instruction No. 17 explained accomplice testimony and the need for corroboration;[2] and Instruction No. 31 also dealt with accountability.

---

knowledge and voluntary action are essential in order to impute guilt.

2.  It is a question of fact for the jury to determine from the evidence and from the law as given you by the court whether or not in this particular case one or more witnesses were or were not accomplices within the meaning of the law.

3.  The testimony of an accomplice ought to be viewed with distrust.

4.  A conviction cannot be had on the testimony of an accomplice unless he/she is corroborated by other evidence which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
2
Defendant's Instruction No. 17:

You are instructed a conviction cannot be had on the testimony of one responsible or legally accountable for the same offense, unless the testimony is corroborated by other evidence which in itself and without the aid of the testimony of the one responsible or legally accountable for the same offense tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.
To be sufficient, corroborating evidence must show more than that a crime was in fact committed or the circumstances of its commission.
The corroborating evidence must show more than a mere opportunity to commit the crime. It must raise more than a

The instructions given adequately stated the law in regard to accomplice testimony. We conclude there was no error regarding jury instruction on accomplice testimony.

As a final argument regarding jury instructions, defendant claims that it was error for the court to instruct the jury that flight by the defendant may show consciousness of guilt. He contends there was no evidence that defendant ever attempted to flee.

At trial defendant did not object to the giving of this instruction, but only that it did not adequately define "flight." The State correctly notes that defendant may not change the basis of his objection on appeal. Sunday, 609 P.2d at 1195. We note, however, that defendant's objection to this instruction on appeal is meritless since at trial a substantial amount of evidence was presented from which the jury could infer defendant's consciousness of guilt and the possibility of flight. Defendant left the community hall immediately after leaving the body, failing to close the gate. He also proceeded to leave Campbell County, Wyoming,

---

suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. But corroborative evidence need not be sufficient, by itself, to support a defendant's conviction or even to make out a prima facie case against him. Corroborating evidence may be circumstantial and can come from the defendant or his witnesses.

One accomplice cannot supply the independent evidence necessary to corroborate another accomplice.

Where the alleged corroborative evidence is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of defendant, then such evidence does not tend to connect him with the commission of the offense and is in the realm of speculation, not corroboration. Where the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corroboration to justify a conviction upon the testimony of an accomplice.

using a fictitious name while hitchhiking. Defendant purchased new clothes and threw away the old blood-spattered clothes in Sheridan, Wyoming. He attempted to destroy evidence in Billings, Montana, after he learned of his brother's arrest. The evidence provided an adequate basis for the flight instruction. We conclude there was no error in the giving of this instruction.

V

Whether certain factual findings in the District Court's sentencing order were supported by the evidence.

Defendant challenges the following findings of fact made by the District Court in its sentencing order:

10. That the victim suffered a subdural hematoma, as a result of the beatings in Custer County, prior to the final beatings which led to his death.

13. That the defendant knew that the victim was married and had a family.

15. That the defendant killed JOHN MARTIN ETCHEMENDY, JR. by beating him on the head with a tire iron, rock and pipe. That the defendant also cut the victim's throat with a small knife and shot at him with a .22 shell which was held in a vice grip.

22. That two of the aggravating circumstances set forth in §46-18-303 of the Montana Code Annotated apply in this case:
    A.   The offense was Deliberate Homicide and was committed by means of torture.

    B.   The offense was Aggravated Kidnapping which resulted in the death of the victim.

Defendant contends that the above quoted findings are not supported by substantial credible evidence. This contention has no merit whatsoever in regard to the first three

25

findings of fact. These three findings are accurate summaries of trial testimony which the court obviously chose to believe. Dr. Robert Deters conducted the victim's autopsy. He stated there was a subdural hematoma on the right side of the head caused by a series of insults to the head. He testified that the hematoma must have occurred at least an hour prior to the injuries to the left side of the head. The only beatings Mr. Etchemendy received prior to being placed in the trunk occurred in Custer County. No testimony indicates that he was beaten again prior to the fatal blows. We conclude that finding number 10 is supported by substantial credible evidence.

As to findings number 13 and 15, Diane Bull Coming testified that defendant knew the victim was married and had two children. She also testified that defendant beat the victim with a tire iron, rock, and pipe, attempted to shoot the victim by use of a vice grip, and that defendant attempted to cut the victim's throat with a knife. Photographs and physical evidence corroborated this testimony. We conclude that these findings by the court are supported by substantial credible evidence.

Defendant contends that the court's finding that the offense of deliberate homicide was committed by means of torture is not supported by the evidence. The fatal blows in Wyoming were brutally accomplished by use of a pipe, a tire iron and a rock. During this beating the victim cried out, "Oh God, no, God, no." Additionally, we cannot rationally separate the final beating from the entire criminal transaction which demonstrated a course of conduct involving brutality and extending over several hours. Prior to delivery of the fatal blows in Wyoming the victim was brutally assaulted several times and confined nude in the small trunk of a car on a cool morning for a number of hours. The evidence

established that these prior beatings in Montana were severe enough to be potentially fatal. Dr. Deters testified that the subdural hematoma was potentially fatal. It is not possible to determine from the medical evidence the extent to which the prior beatings contributed to the victim's death. The beatings and restraint, culminating in the bludgeoning to death of the victim, constitute substantial credible evidence that the homicide was committed by means of torture.

The determination that these acts were torturous is consistent with this Court's previous holdings regarding torture in death penalty cases. See, e.g., State v. Dawson (Mont. 1988), 761 P.2d 352, 360, 45 St.Rep. 1542, 1551-52, cert. denied, 109 S.Ct. 3200 (1989); (evidence supported finding that deliberate homicide was committed by means of torture where victims were bound and gagged in each others' presence, injected with unknown drugs, and strangled); State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023, vacated, 433 U.S. 905 (1977), on remand, 177 Mont. 280, 581 P.2d 1205 (1978), cert. denied, 443 U.S. 912 (1979), on remand, 186 Mont. 481, 608 P.2d 428 (1980), cert. denied, 449 U.S. 1050 (1980) (holding that deliberate homicide was committed by means of torture where victim was killed by a blow which laid open her head, prior to which she was nonfatally strangled). We conclude that there exists substantial credible evidence to support a finding that defendant caused the victim's death by torture. We affirm the sentencing court's finding on this issue.

VI

Whether imposition of the death penalty is constitutional under the mandatory review criteria of § 46-18-310, MCA.

On appeal, defendant also challenges the constitutionality of Montana's sentencing statutes which govern imposition of the death penalty. Defendant relies on a recent Ninth

Circuit case, Adamson v. Ricketts (9th Cir. 1988), 865 F.2d 1011, petition for cert. filed, 57 U.S.L.W. 3739 (U.S. March 20, 1989) (No. 88-1553). In Adamson, the Ninth Circuit declared unconstitutional Arizona's sentencing statutes which govern imposition of the death penalty. In comparing Arizona's statutes with those of Montana, we note that they are similar.

Defendant did not raise this specific objection to Montana's sentencing statutes at District Court. Although defendant urges that he could not have raised this contention at District Court since the Adamson case had not yet been decided, nevertheless we decline to address this issue on appeal. First, the Adamson decision is not binding on Montana, and we note that the decision has been appealed to the United States Supreme Court. Second, this issue was not raised at District Court and was neither substantively briefed nor argued before this Court. Thus it is not appropriate for this Court to consider the issue. As a final comment, we note that this Court has previously held these statutes to be constitutional based on similar challenges in Dawson, 761 P.2d at 360, and State v. Smith (1985), 217 Mont. 461, 490-91, 705 P.2d 1087, 1105-06, cert. denied, 474 U.S. 1073 (1986).

We conclude that the imposition of the death penalty was constitutional under the review criteria of § 46-18-310, MCA.

VII

Whether the sentencing court committed prejudicial error in its consideration of victim impact statements.

Although defendant does not raise this issue on appeal, we note that in its sentencing order the District Court made a finding of fact regarding the impact the victim's death has had on family members. That finding of fact states:

20. the victim's family has been deprived of a son, husband and brother and the parents of the victim have been for some time and now are undergoing psychiatric counselling as a result of their son's death.

The United States Supreme Court, in Booth v. Maryland (1987), 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, held that the jury's consideration of a victim impact statement in that case was error, requiring resentencing. We choose to discuss this issue in the present case.

In Booth, the State of Maryland had a statute requiring consideration at sentencing of victim impact statements if the victim suffered injury or death. In Booth the sentencing was done by the jury. The defendant was convicted of the murder of an elderly couple. Before sentencing, a lengthy statement written by the Maryland Division of Parole and Probation was read to the jury. It contained statements made by several family members, including a son, daughter, and granddaughter. The statements described the good character and reputation of the victims, and the emotional distress suffered by the various family members. The statement was lengthy and poignant, containing many facts regarding the impact on the family.

The court held that consideration of the statement violated the Eighth Amendment in that it could influence the jury to impose sentence in an arbitrary or capricious manner. The court stated that a victim impact statement is irrelevant, that it improperly diverts the jury's attention away from the defendant and the crime, and that it is inconsistent with the reasoned decision-making required in a capital case. Booth, 482 U.S. at 503-09.

In the present case the record contains no written victim impact statements. The source of the information about the parents' counselling is from the father's testimony

29

at the presentence hearing. At this hearing the father also testified that the victim graduated from Montana College of Mineral Science and Technology with honors, that he had a wife and two sons, and that the wife had moved in with her parents since her husband's death. The father stated his opinion that this was an appropriate case for the death penalty.

In two recent Montana cases this Court discussed whether consideration of victim impact statements at sentencing constituted reversible error. In Dawson, the presentence investigation report contained a three paragraph victim impact statement, which stated that three members of a family had died as a result of the homicide, and that the teenage daughter was undergoing counseling but "not doing so well." This Court concluded that Booth was not controlling in that sentencing was by the court, not the jury, and because the victim impact statement was not as lengthy or poignant as the one in Booth. Dawson, 761 P.2d at 361. See also State v. Keith (Mont. 1988), 754 P.2d 474, 487-88, 45 St.Rep. 556, 573-75. The present case is distinguishable from Booth in that sentencing was by a judge rather than a jury, and there was no written victim impact statement. The testimony by the father was neither lengthy nor emotional. It was clearly not as questionable as the information considered in Booth. We conclude there was no reversible error in the sentencing court's consideration of the statements.

VIII

Supreme Court sentence review pursuant to § 46-18-310, MCA.

In reviewing a death sentence pursuant to § 46-18-310, MCA, this Court must determine 1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; 2) whether the evidence supports the

30

court's findings on any mitigating and aggravating circumstances; and 3) whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Appellant has not contended that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. In Issue VII we discussed the District Court's consideration of a victim impact statement and concluded that there was no indication that defendant was prejudiced by this. Additionally, we note that the findings of the sentencing court are lengthy and dispassionate. From our review of the entire record we conclude that there is no indication that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

The second determination requires this Court to consider whether the evidence supports the sentencing court's findings of aggravating and mitigating circumstances. The court found two aggravating circumstances. It determined that the offense was deliberate homicide committed by means of torture, and also that the offense was aggravated kidnapping which resulted in the death of the victim. In Issue V we discussed the court's finding that the deliberate homicide was committed by means of torture, concluding that substantial credible evidence supported this finding. In Issue I we discussed the elements of aggravated kidnapping and the elements of deliberate homicide under the felony murder rule. We determined that the elements of each offense were satisfied. From this previous determination, we conclude that the second aggravating circumstance was supported by substantial credible evidence.

The sentencing court found that the only possible mitigating circumstance was that the defendant had no significant history of prior criminal activity. It went on to conclude

31

that when compared to the enormity of the offenses committed and circumstances thereof, that the mitigating circumstance was not sufficiently substantial to call for leniency. This same mitigating circumstance was present in Dawson, wherein this Court affirmed the sentencing court's refusal of leniency in light of the offenses committed. Dawson, 761 P.2d at 361-62. See also Smith, 705 P.2d at 1097; State v. Coleman (1979), 185 Mont. 299, 331-32, 605 P.2d 1000, 1019-20, cert. denied, 446 U.S. 970 (1980). In the present case, in view of the offenses committed, we conclude that the evidence supports the court's finding that the mitigating circumstance is not sufficiently substantial to call for leniency.

Finally, this Court must determine whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendants. Defendant has presented no argument on this, however in accordance with our statutory duty, we have compared the following cases appealed to this Court which involved similar crimes for which the death penalty was or could have been imposed: Dawson; State v. Keefe (1988), 759 P.2d 128, 45 St.Rep. 1034; Keith; Smith; State v. Fitzpatrick (1980), 186 Mont. 187, 606 P.2d 1343, cert. denied, 449 U.S. 891 (1980), rev'd on other grounds, 869 F.2d 1217 (9th Cir. 1989), cert. denied, 110 S.Ct. 203 (1989); Coleman; and McKenzie.

After examination of such factors as the gravity of the offenses, the brutality with which they were committed, and the existence of any factors meriting leniency, we hold that the sentence in the present case is not disproportionate or excessive to others imposed in similar cases. All the above-cited cases, except Keefe, involved a death penalty imposed for the aggravated kidnapping and subsequent homicide of a victim. So too does this case. The factor meriting leniency in Keefe, namely, the fact that Keefe was under the

age of 18 at the time he committed the three homicides and thus given life rather than death sentences, does not exist in this case. Lester Kills on Top was 25 years of age at the time he committed the charged crimes. We conclude that the homicide in this case, as in the other above-mentioned cases, involved the vicious, senseless, and calculated killing of an innocent person.

IX

Whether the present death penalty constitutes cruel and unusual punishment prohibited by the United States and Montana Constitutions.

We here respond in part to the dissent which contends that the death penalty in this case constitutes cruel and unusual punishment prohibited by the Constitutions. The Eighth Amendment to the United States Constitution and Montana Constitution Article II, Section 22, prohibit punishment which is cruel and unusual. The death penalty is not in all circumstances cruel and unusual punishment, Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, but it may not be imposed arbitrarily or capriciously, Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

Using the factors cited by Justice Brennan in Furman, the dissent concludes that the death penalty in this case constitutes cruel and unusual punishment because the death penalty is not acceptable to contemporary Montana society, and because the death penalty statutes of Montana allow for arbitrary conduct.

In Montana we have a much clearer expression of the view of the citizens of the State than is present in many other states. In 1972 the people of Montana decisively voted to retain the death penalty. As stated in State v. McKenzie (1976), 171 Mont. 278, 294, 557 P.2d 1023, 1033:

> . . . The people of Montana voted for 147,023 and
> against 77,733, to retain the death penalty. Such
> a vote, so recently, negates any argument the death
> penalty violates contemporary standards of decency.

A statewide election less than 20 years ago, in which the majority vote approved the death penalty by approximately 2-1, profoundly supports a conclusion that the death penalty is acceptable to the contemporary society of Montana.

After the decision of the United States Supreme Court in Furman, as well as the cases decided by that court in 1976, the Montana Legislature in 1977 enacted the extensive provisions in death penalty sentencing which are set forth today in §§ 46-18-301 through 310, MCA. A brief summary of the key portions of those sections follows. Section 46-18-301, MCA, provides that the judge who presided at the trial shall conduct a separate sentencing hearing to determine the existence or nonexistence of the aggravating and mitigating circumstances set forth in §§ 46-18-303 and 304, MCA. Section 46-18-302, MCA, provides in pertinent part as follows:

> In the sentencing hearing, evidence may be present-
> ed as to any matter the court considers relevant to
> the sentence, including but not limited to the
> nature and circumstances of the crime, the defen-
> dant's character, background, history, and mental
> and physical conditions and any other facts in
> aggravation or mitigation of the penalty . . .
> Evidence admitted at the trial relating to such
> aggravating or mitigating circumstances shall be
> considered without reintroducing it at the sentenc-
> ing hearing. . . .

Section 46-18-303, MCA, enumerates specific aggravating circumstances. The aggravating circumstances in this case were that the offense was deliberate homicide and was committed by means of torture, and that the offense was aggravated kidnapping which resulted in the death of the victim. Section 46-18-304, MCA, sets forth mitigating circumstances.

34

The only one found by the District Court was that the defendant had no significant history of prior criminal activity. The most recent amendment to this part of the statutes included an aggravating circumstance added by the Legislature in 1989. While the view of the Montana Legislature does not necessarily establish the view of the people of Montana, it does indicate a continuing attempt on the part of the Montana Legislature to maintain the death penalty in Montana, while meeting the requirements set forth by the various decisions of the United States Supreme Court. We conclude that the death penalty is acceptable to the contemporary society of the State of Montana.

The dissent concludes that Montana's statutes allow for arbitrary conduct on the part of the sentencing judge. In his special concurrence in McKenzie, Justice Haswell considered the issue of whether the Montana statutes governing imposition of the death penalty were arbitrary. He concluded they were not arbitrary and that they met the standards of Furman. McKenzie, 557 P.2d at 1045-46. Since the date of McKenzie, the Montana Legislature has added the statutory list of mitigating factors which must be considered, and has made other amendments as well.

The dissent points out that under the provisions of § 46-18-302, MCA, the sentencing court may consider "any matter relevant to the sentence whether or not admissible under criminal rules." The dissent suggests that this giving of broad discretion allows consideration of additional aggravating factors which have no direct bearing on the criminal responsibility of the defendant. As previously quoted, § 46-18-302, MCA, does allow consideration of other matters by the sentencing court. We further note that under that section, the sentencing court is allowed to consider evidence admitted at the trial relating to both aggravating and

mitigating circumstances without any reintroduction of that evidence. We also note that the sentencing court is required to make specific written findings of fact. Section 46-18-306, MCA. Further, it is appropriate that the sentencing court consider all evidence relevant to sentencing. This Court has previously concluded that the consideration of aggravating factors other than those statutorily enumerated was appropriate. In McKenzie v. Osborne (1982), 195 Mont. 26, 640 P.2d 368, defendant attacked the sentence on the ground that the court had relied on aggravating factors other than those found in our statutes. This Court stated that the factors "properly relate to the propriety of the sentence of death." McKenzie, 640 P.2d at 382.

The requirement that the sentencing court make these findings is significant when considering the issue raised by the dissent in regard to the jury verdict which found defendant guilty under the felony murder rule, and certain findings by the sentencing court indicating that defendant killed the victim. The dissent suggests the court's findings and the verdict are inconsistent and that the sentencing court became the fact-finder. We emphasize however, that these findings by the sentencing court were not improper.

In Enmund v. Florida (1982), 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, the court held that the death penalty may be imposed if defendant killed, attempted to kill, or intended to kill or that lethal force be used. This determination as to defendant's culpability need not be made by a jury, but may be made at any point in the state criminal process. Cabana v. Bullock (1986), 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704, overruled in part on other grounds; Pope v. Illinois (1987), 481 U.S. 497, 504, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439, 447. See also Tison v. Arizona (1987), 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127.

36

Applying the rule of _Enmund_ and _Cabana_, the sentencing court made the determination that defendant killed the victim. We conclude that the findings and conclusions by the sentencing court are properly within the provisions of the statutes and that there is no contradiction present casting doubt on the validity of the death penalty. Under our statutory provisions, the sentencing judge is clearly given the responsibility and power to make this determination.

Our statutes now give adequate standards and guidelines to be applied by the sentencing court, yet allow for and encourage individualized sentencing. In Montana, sentence is imposed by the district court judge, whose background and experience is in comparing aggravating and mitigating factors.

We conclude that in Montana the death penalty is acceptable to contemporary society, is not excessive for the crimes for which it may be imposed, and that our statutes guiding the sentencing process and our provisions for sentence review do not allow the prohibited arbitrary conduct on the part of the sentencing court.

We hold that the death penalty here does not constitute cruel and unusual punishment prohibited by the United States and Montana Constitutions.

Having reviewed the entire record in this case in affirming the determinations by the judge of the District Court, and in consideration of the _Enmund_ and _Cabana_ rules, this Court also independently finds and concludes that defendant killed Martin Etchemendy, Jr. We also find and conclude that two statutory aggravating circumstances were present in that the offense was deliberate homicide committed by means of torture and that the offense was aggravated kidnapping which resulted in the death of the victim. We therefore affirm both the convictions and the sentences.

X

This Court has reviewed the entire record and applicable law and hereby affirms the sentences of death imposed by the District Court. This case is remanded to the District Court which shall set a date for execution in accordance with the statutes.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice John Conway Harrison specially concurring.

I concur with the majority. I note with considerable interest the dissent of Mr. Justice Sheehy, and while I cannot concur in his dissent, I feel the time has come to note the frustrations of State Appellate Justices in capital cases. Like Justice Sheehy, I have authored three of some twelve cases that have been before this Court in the past twenty-nine years. In addition, I have read the briefs and voluminous transcripts of every case in which I upheld the death sentence. It was not a pleasant task to say the least, however, it comes with this office.

I find myself disagreeing with some of Mr. Justice Sheehy's dissent and, in taking issue with his statements, I do not question either his integrity or his right to change his mind. First he notes that whether the death penalty is acceptable to contemporary Montana society is arguable. As he notes the last time it was submitted to the people of this State it was overwhelmingly approved. Yet as he says the last death penalty sentence that was carried out in this State was in 1944. What he fails to note is that in the past thirty years the United States Supreme Court has twice found State laws providing for the death sentence unconstitutional. This necessitated twenty-one States passing new laws in order to comply with the United States Supreme Court's opinions. Montana is one of those States. After each of the

39

United States Supreme Court's opinions, a thousand or more persons sentenced to death had their sentences changed to life sentences and many of these people have since been paroled or have served the maximum time and returned to the various communities of this country. I find the fact that the States have redone their laws twice in this period indicative of strong support for the death sentence in those states.

Likewise I disagree with his premise that the Montana experience since 1977, when the legislature put the sentencing in the hands of the trial judge, rather than the jury, cannot be said to represent the wide spectrum of public sentiment on social issues called for by the Supreme Court in Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, reh. den. 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158, (1976). Rather, I find that trial judges, like appellate judges, take great care and caution before ever sentencing a person to death. I believe this protection for a defendant prevents runaway jury passions.

It is not the various State trial judges or justices of appellate courts who have delayed the carrying out of their laws on capital punishment. That obvious honor belongs in the Federal system. The worst example in this State is that of Duncan McKenzie who was convicted in 1975, and who has now spent some fourteen years on death row. There was a time in our history when people worried about the execution of Caryl Chessman, a murderer in

California, who spent some seven years on California's death row. Chessman v. Teets (1957), 354 U.S. 156, 77 S.Ct. 1127, 1 L.Ed.2d 1253. He was just a newcomer to death row compared to McKenzie, whose case has been like a yo-yo ever since it left this Court and went into the Federal system. It has been said of McKenzie's case that he has a death sentence but "he will carry it out by dying of old age."

There is no more difficult work, nor emotional task than that given jurors, trial judges and appellate justices in finding a human being guilty of murder, and sentencing, upholding or approving of a death sentence. In each of the cases heard and approved by this Court we have had twelve jurors find the defendant guilty, a trial judge both approve of their findings and give the sentence, followed by seven appellate justices carefully reading the record and finding that the defendant had a fair trial and was properly sentenced. Throughout the trial and appellate proceedings, competent trial lawyers plus judges and justices, many of whom have tried and defended capital cases in their practice, have been given the duty of administering justice. However, once it leaves the State jurisdiction and goes into the Federal system often times, due to the multiple cases before both the Circuit Courts and the Supreme Court, law clerks review the work of the State jurisdiction. While the United States Supreme Court can ask for transcripts of the cases I am informed that often they do not

41

have them as did the State Supreme Courts in their review of the cases. As a result we have over 2,000 prisoners on death row in the various States having capital punishment statutes. The law should have some finality but as witnessed above in the McKenzie case, there seems to be none. Only the United States Supreme Court can provide the answer and that answer is long overdue.

John Conway Harrison
Justice

Justice William E. Hunt, Sr. specially concurs:

I concur with the result reached by the majority opinion, but do not agree with all that is said in that opinion.

_____
Justice

Justice John C. Sheehy, dissenting:

## I.

For a long time I have had the moral conviction that exacting the penalty of death in criminal cases was improper. I have come to the legal conviction that the death penalty is indeed cruel and unusual punishment and so prohibited by the Eighth Amendment to the United States Constitution. The Cruel and Unusual Punishment Clause is applicable to the states through the Due Process Clause of the Fourteenth Amendment. Robinson v. California (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758.

This case comes to us on a direct appeal and also under the automatic review of death penalty sentences pursuant to § 46-18-307, MCA. Whether on appeal or under automatic review, this Court is required under § 46-18-310, MCA, to determine whether or not the death sentence was properly imposed by the District Court. The automatic review provision was adopted by the legislature in 1977, as an obvious response to Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. The history of the action by the states following Furman is set out in Pulley v. Harris (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29. There the Supreme Court stated:

> Harris's submission is rooted in Furman v. Georgia, 408 U.S. 238 (1972). In Furman, the court concluded that capital punishment, as then administered under the statutes vesting unguided sentencing discretion in juries and trial judges, had become unconstitutionally cruel and unusual punishment. The death penalty was being imposed so discriminatorily (408 U.S. at 240) (Douglas, J. concurring) so wantonly and freakishly, id. at 306, (Stewart, J. concurring), and so infrequently, id. at 370 (White, J. concurring),

44

that any given death sentence was cruel and unusual. In response to that decision, roughly two-thirds of the States promptly redrafted their capital sentencing statutes in an effort to limit jury discretion and avoid arbitrary and inconsistent results. All of the new statutes provide for automatic appeal of death sentences. Most, such as Georgia's, require the reviewing court, to some extent at least, to determine whether, considering both the crime and the defendant, the sentence is disproportionate to that imposed in similar cases. Not every State has adopted such a procedure. In some States, such as Florida, the appellate court performs proportionality review despite the absence of the statutory requirement; in others, such as California and Texas, it does not.

Pulley, 465 U.S. at 44.

The appeal here and the automatic review provisions bring to this Court once again yet another death penalty case and brings me face to face with the ultimate question, is the imposition of the death as prescribed by Montana statutes in capital cases cruel and unusual punishment and so forbidden by the United States Constitution? Indeed, does the imposition of the death penalty also offend our state constitution which likewise prohibits cruel and unusual punishment (Art. II, § 22, 1972 Mont. Const.)? I have firmly concluded that it does offend the federal and state constitutions to impose a death penalty and in that conclusion I align myself with the position taken by Mr. Justice William Brennan in Furman v. Georgia, supra. There, Justice Brennan discussed in full terms the background of the death penalty history, the reasons given for it and the reasons against it, and concluded finally that the death penalty was unconstitutional.

Justice Brennan based his conclusion upon four principles: (1) the punishment must not be so severe as to be degrading to the dignity of human beings; (2) the

imposition of the sentence must not be arbitrary; (3) the severe punishment must not be unacceptable to contemporary society; and, (4) the severe punishment must not be excessive.

Whether the death penalty is acceptable to contemporary Montana society is arguable. When the state constitution was submitted to the voters in 1972, they were given a chance to vote on the acceptability of the death penalty. It was widely endorsed. Yet, the last death penalty imposed and carried out in Montana before the adoption of the 1972 Montana Constitution was in 1944. For at least 30 years, until the adoption of the provisions of automatic review, the death penalty had not been imposed in the state. Until 1966, the determination of whether the death penalty should be imposed was given first to the discretion of the jury, and, if the jury left the punishment to the court, then to the presiding judge. Section 94-2505, R.C.M. (1947). Thus, while the voters in 1972 as an abstract proposition accepted the death penalty, juries and after them the district judges, when faced with real cases, did not impose the death penalty. We frequently state in support of the jury system, that because of their very number, a jury represents the sense of community values in deciding cases. The U.S. Supreme Court once said that jury reluctance in death cases possibly reflected "the humane feeling that this most irrevocable sanction should be reserved for a small number of extreme cases." Gregg v. Georgia (1976), 428 U.S. 153, 182, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859. The Montana experience since 1977 indicates that judges are far more likely than juries to impose the death sentence. A district judge acting singly cannot be said to represent the wide spectrum of public sentiment on social issues.

Moreover, at the time of the state vote on the death penalty in 1972, the only mode of execution allowed by our law was hanging by the neck until dead. In 1983, (Ch. 411, Laws of Montana (1983)) the legislature amended the law of § 46-19-103, MCA, to permit the defendant to choose death by lethal injection of an "ultra-fast-acting" barbiturate instead of hanging. In itself, this amendment is an admission by the legislature that death by hanging is too horrible to contemplate. Whether death by lethal injection of a drug is less horrible, we do not know. None has experienced it yet in Montana as punishment for a crime. We have no reports from other states on the subject, largely because of "that undiscovered country from whose bourne no traveler returns to tell us of the way." What the change from hanging to lethal injection does tell us is that Montanans are seeking an easier way to end human life for crime. In truth, there is no easy way.

Another of Justice Brennan's tests as to whether punishment is cruel and unusual is whether it is imposed arbitrarily. As I explain below, in this case the death penalty was imposed arbitrarily, and the present statutes adopted by Montana allow such arbitrary treatment.

It was not easy for me to conclude on constitutional grounds that the death penalty was improper, even though I oppose it on moral grounds. When first I came to this Court, I was imbued with the responsibility of judges to uphold the constitution and thus subordinated my moral feelings to my thought that I should put those aside and decide this type of case solely on what I perceived to be legal grounds. In fact, I authored two opinions affirming death penalties. State v. Coleman (1979), 185 Mont. 299, 605 P.2d 1000; State v. Fitzpatrick (1980), 186 Mont. 187, 606 P.2d 1343. All through the 1980s, these cases have been

grinding their way through the federal system and most recently, each has been reversed and remanded. Execution by death of several other defendants in Montana are on hold because of further proceedings, including the oldest case, where, even though the death penalty was affirmed in 1976, no execution date is now set as far as I know. State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023. Thus, even though the death penalty has been on the books at all times no person has been executed in Montana in the last 45 years as punishment for crime. There has been no more than slight public reaction. That, too, tells us something about community standards and values.

## II.

As is stated above, the Montana statutes permit the imposition of the death penalty arbitrarily. In this case, the court in fact acted arbitrarily in finding factors for the imposition of death.

It is provided in § 46-18-305, MCA, that the District Court in determining whether to impose a sentence of death or imprisonment "shall take into account the aggravating and mitigating circumstances enumerated in § 46-18-303, MCA, and § 46-18-304, MCA, and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds there are no mitigating circumstances sufficiently substantial to call for leniency." There are nine aggravating circumstances listed in § 46-18-303, MCA, and eight mitigating circumstances listed in § 46-18-304, MCA. When read in conjunction with § 46-18-305, MCA, a proper interpretation would be that the District Court is limited in determining aggravating factors to § 46-18-303, and in determining mitigating circumstances, to § 46-18-304.

Opposed to the concept that the court is limited under § 46-18-305 to the statutory aggravating circumstances and

mitigating circumstances is the language of § 46-18-302. That section provides that the District Court in sentencing may consider any matter relevant to the sentence whether or not admissible under criminal trial rules and the District Court is given broad discretion as to whether it may consider such evidence as probative. Thus, the door is wide open in the sentencing procedure for the District Court to consider not only the aggravating circumstances listed in § 46-18-303 but additional factors which would have no direct bearing on the criminal responsibility of the defendant.

This case illustrates arbitrary findings by the District Court of circumstances other than those listed in § 46-18-303. Of the statutory aggravating circumstances, the only one picked up by the court and used to justify the death sentence is that the offense was deliberate homicide and was committed by means of torture. The only mitigating circumstance found by the court was the defendant had no significant history of prior criminal activity. If § 46-18-305 is read properly, these are the only aggravating and mitigating circumstances which the court should have considered in sentencing the defendant. However, the District Court chose, apparently under the broad language of § 46-18-302 to add a number of aggravating factors, not statutory factors, including the following: that the defendant knew the victim was married and had a family (par. 13) (this is disputed by the defendant); that the defendant had no real employment history, and never held a job for any appreciable length of time, and at the age of 26 years had children by three different women, none of whom he supported (par. 19); and that the victim's family had been deprived of a son, husband or brother and that the parents of the victim are now undergoing psychiatric counseling because of their son's death (par. 20) None of these is listed as a

statutory aggravating circumstance and only the District Court judge knows what influence these additional factors had in bringing about the sentence of death.

Thus, the Montana statutes on the subject permit arbitrary action by the District Court of the highest degree, since the result can be so drastic and irreversible.

Now, it is true that in Lockett v. Ohio (1976), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, the United States Supreme Court held that because the death penalty is so profoundly different from all other penalties, individualized decision-making is essential in capital cases. To that end, the Supreme Court endorsed in Lockett that at the sentencing hearing, evidence outside the trial record relating to the defendant's character or the circumstances of the offense, but only as mitigating factors could be considered. The Court said:

> We are now faced with those questions and we conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest capital case, not be precluded from considering, as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death . . . (Emphasis in original.)

Lockett, 438 U.S. at 604.

Thus, the provisions of § 46-18-302, MCA, which open the door to extraneous evidence having to do with the sentence has judicial blessing only as to mitigating factors. The use of extraneous evidence to find aggravating factors, over and above those statutorily provided or implicit in the crime itself, have no such blessing. One of the important reasons is that if such aggravating factors are to be considered in connection with the fixing of death as punishment, the defendant ought to be entitled to a trial

by jury as to those factors, and that brings me to a further problem with respect to the Montana statutes.

In Adamson v. Ricketts (9th Cir. 1988), 865 F.2d 1011, the Circuit Court had before it a habeas action against the Arizona director of the Department of Corrections. The Federal District Court held, among other things, that Arizona's statutory scheme for the imposition of the death penalty unconstitutionally limited the court's consideration of mitigating circumstances and allowed an arbitrary imposition of the death penalty.

The Circuit Court held that the Arizona statutes (which are much like Montana's) permitted elements of the offense to be determined by the sentencing judge, which deprived the defendant of the right to trial by jury as to all of the elements of the crime and thus violated the Sixth and Fourteenth Amendments. The Circuit Court also determined that the examination of death sentencing statutes required heightened scrutiny. It further held that there must be a strict separation between the determination of guilt and innocence (fact-finding) and the determination of an appropriate punishment (sentencing). The Adamson case is now on appeal to the United States Supreme Court.

In the case we are now considering, the District Court engaged in extensive fact-finding relating to the defendant's guilt or innocence in imposing the death sentence. It found that the offense was deliberate homicide and was committed by means of torture; it found extraneous circumstances as are noted above. The greatest problem, however, is that the District Court in effect found that the defendant had committed the crime directly, although my interpretation of the charges against Lester Kills On Top and the verdicts found against him relate to accountability

51

under the felony-murder rule. The District Court claimed that he was not convicted under the felony-murder rule.

The majority had accepted the finding of the District Court that defendant committed the crime directly, and beyond that, the majority now declare also, after a review of the record, that the defendant did kill Martin Etchemendy, Jr. The jury found otherwise when it returned a verdict of not guilty on the deliberate homicide charge. In so acting, the majority have misinterpreted Enmund v. Florida (1982), 458 U.S. 782, and Cabana v. Bullock (1986), 474 U.S. 497. Nothing in those cases gives a sentencing court, or an appellate court, the right to reverse a jury verdict to achieve a hanging or a lethal injection of the defendant. (See Cabana, 474 U.S. at 386, fn. 5).

Attached to this dissent as an exhibit are the five counts of the amended information under which the defendant was charged, and the jury verdict with respect to each count. It will be seen that the defendant was found guilty under Count I of robbery in the course of committing, or aiding and abetting in the commission of, a theft from the victim while inflicting, or aiding and abetting bodily injury upon the victim. He was found not guilty under Count II of aggravated kidnapping for the purpose of facilitating the commission of the crime of robbery. He was found guilty in Count III of aggravated kidnapping with the purpose of inflicting bodily injury or terrorizing the victim. He was found not guilty under Count IV of deliberate homicide. He was found guilty under Count V of deliberate homicide in that he was engaged in the commission of or legally accountable for the commission of aggravated kidnapping, resulting in the death of the victim which was caused by the defendant or another person legally accountable for the crime of aggravated kidnapping.

52

It is clear to me that if the defendant here was not found guilty under the felony-murder rule on the basis of accountability, then the verdicts are inconsistent because the jury did not find him guilty of direct deliberate homicide or direct aggravated kidnapping. In fact, even his robbery conviction seems to be on the basis of accountability.

The whole tenure of the District Court's findings with respect to the sentence of death is that the defendant committed the acts directly. No mention is made in the findings either of the felony-murder convictions or of accountability. Thus, the District Court has either ignored the jury verdict, and improperly sentenced the defendant for directly committing crimes for which he has not been convicted by the jury or the District Court has become the sole fact-finder in spite of the jury's verdict. In either event, the defendant has been deprived of his right to a jury trial.

Fifteen states do not provide a death penalty in capital cases. Of the 35 states that do so provide, only four allow the judge, and not the jury, to determine the aggravating factors and mitigating circumstances for the imposition of the death penalty. Here, the District Court found that the defendant had committed deliberate homicide and caused the death of the victim by torture. While it may be a question of semantics, it is nonetheless true that no jury determined that the victim died by torture. The jury did determine that his death was caused by the infliction of bodily injury and by terror.

Since the death penalty hinges in Montana on the statutory aggravating circumstances of § 46-18-303, MCA, those aggravating circumstances are an element of the crime, and the defendant is entitled to a jury trial as to those

elements.  In Montana, the right to a jury trial is by our Constitution, secured to all and shall "remain inviolate." Art. II, § 26, 1972 Mont. Const.  The Sixth Amendment to the United States Constitution guarantees an impartial jury trial in criminal prosecutions.  Montana statutes deprive a defendant in a capital case of a jury trial on the most critical elements that relate to his sentence.

In this case, therefore, I would uphold the conviction of the defendant for robbery, aggravated kidnapping, and deliberate homicide.  I would remand the cause to the District Court for resentencing of the defendant but forbid the death penalty.

_John C. Sheehy_
Justice

## EXHIBIT TO THE DISSENT OF JUSTICE JOHN C. SHEEHY

The following are the charges against the defendant Lester Kills On Top, with the jury result as to each count:

## AMENDED INFORMATION

### COUNT I

The Defendant, LESTER KILLS ON TOP, committed the offense of Robbery, a felony, as defined in §45-5-401(1)(a) and §45-2-302(3), MCA in that on or about October 17, 1987, in Custer County, Montana and Campbell County, Wyoming, LESTER KILLS ON TOP did, in the course of committing or aiding and abetting in the commission of a theft from JOHN MARTIN ETCHEMENDY, JR., inflict, or aided and abetted in inflicting, bodily injury upon JOHN MARTIN ETCHEMENDY, JR., contrary to the form, force and effect of the statutes in such cases made and provided, and against the peace and dignity of the State of Montana.

JURY VERDICT:  Guilty

## COUNT II

The Defendant LESTER KILLS ON TOP, committed the offense of Aggravated Kidnapping, a felony, as defined in §45-5-303(1)(b) and §45-2-302(3), MCA, in that on or about October 17, 1987, in Custer County, Montana and Campbell County, Wyoming, LESTER KILLS ON TOP did purposely or knowingly and without lawful authority restrain or aid and abet in restraining JOHN MARTIN ETCHEMENDY, JR. by holding or aiding and abetting in holding him in a place of isolation, or by using or aiding and abetting in the use of physical force against JOHN MARTIN ETCHEMENDY, JR. with the purpose of facilitating the commission of the crime of Robbery, a felony, or the flight thereafter, contrary to the form, force and effect of the statutes in such case made and provided, and against the peace and dignity of the State of Montana.

JURY VERDICT:   Not guilty

## COUNT III

### (Alternative Count to Count II)

The Defendant, LESTER KILLS ON TOP, committed the offense of Aggravated Kidnapping, a felony, as defined in § 45-5-303(1)(c) and §45-2-302(3), MCA, in that on or about October 17, 1987, in Custer County, Montana and Campbell County, Wyoming, LESTER KILLS ON TOP did purposely or knowingly and without lawful authority restrain or aid and abet in restraining JOHN MARTIN ETCHEMENDY, JR. by holding or aiding and abetting in holding him in a place of isolation or by using or aiding and abetting in the use of physical force against JOHN MARTIN ETCHEMENDY, JR. with the purpose of inflicting bodily injury on or terrorizing JOHN MARTIN ETCHEMENDY, JR., contrary to the form, force and effect of the statutes in such case made and provided, and against the peace and dignity of the State of Montana.

JURY VERDICT:   Guilty

## COUNT IV

The Defendant, LESTER KILLS ON TOP, committed the offense of Deliberate Homicide, a felony, as defined in §45-5-102(1)(b), MCA, in that on or about October 17, 1987, in Custer County, Montana and Campbell County, Wyoming, while LESTER KILLS ON TOP was purposely or knowingly engaged in the commission of or legally accountable for the commission of Robbery, or flight after the commission of the crime of Robbery, a felony, which involved the use of physical force and violence against JOHN ETCHEMENDY, JR., the death of JOHN MARTIN ETCHEMENDY, JR. was caused by LESTER KILLS ON TOP or another person legally accountable for the crime of Robbery, contrary to the form, force and effect of the statutes in such case made and provided, and against the peace and dignity of the State of Montana.

JURY VERDICT:   Not Guilty

## COUNT V

### (Alternative County to Count IV)

The Defendant, LESTER KILLS ON TOP, committed the offense of Deliberate Homicide, a felony, as defined in § 45-5-102(1)(b), MCA, in that on or about October 17, 1987, in Custer County, Montana and Campbell County, Wyoming, while LESTER KILLS ON TOP was purposely or knowingly engaged in the commission of or legally accountable for the commission of Aggravated Kidnapping, or flight after the commission of the crime of Aggravated Kidnapping, or flight after the commission of the crime of Aggravated Kidnapping, a felony, which involved the use of physical force and violence against JOHN MARTIN ETCHEMENDY, JR., the death of JOHN MARTIN ETCHEMENDY, JR. was caused by LESTER KILLS ON TOP or another person legally accountable for the crime of Aggravated Kidnapping contrary to the form, force and effect of the statutes in such case made and provided, and against the peace and dignity of the State of Montana.

JURY VERDICT:   Guilty